PITMAN, J.
hA jury convicted Defendant Leslie C. Thompson, the mayor of the Town of Jonesboro (“the Town”), as charged of three counts of malfeasance in office. As to Count I, the trial court sentenced Defendant to three years at hard labor with a $1,000 fine. As to Count II, the trial court sentenced Defendant ,t° three years at hard labor with a $1,000 fine. As to Count III, the trial court sentenced Defendant to' five years at hard labor, with all five years suspended and Defendant placed on supervised probation upon his release from incarceration, with a $1,000 fine and an order to pay court costs. The trial court ordered Counts I and II to run consecutively with each other and concurrently with Count III. It also ordered that, during the course of the five-year supervised *148 probation, Defendant make restitution to the Town in the amount of $51,792.81. For the following reasons, we affirm Defendant’s convictions. We vacate his sentences and remand the matter to the trial court for resentencing consistent with this opinion.

FACTS

Defendant assumed the office of mayor of the Town on January 1, 2007. On March 5, 2013, the state filed a bill of information charging Defendant with three counts of malfeasance in office in violation of La. R.S. 14:134, 33:404 and 14:24. The bill of information alleged that:
he, being a public officer or public employee, did intentionally fail to perform a duty required of him, as such officer or employee, and intentionally performed such duty in an unlawful manner, and knowingly permitted other public officials and public employees, under his authority, to intentionally refuse or fail to perform such duty lawfully required of him, or perform such duty in an unlawful manner by failing to direct the administration and operation of the liTWn of Jonesboro, including all municipal departments, offices, and agencies, in conformity with provisions of state law in that
Count I: on or about June 30, 2007 through June 30, 2012, in violation of La. R.S. 24:513, La. R.S. 24:518, La. R.S. 44:36, and La. R.S. 44:412, he:
1.neglected, failed or refused to furnish the legislative auditor with such papers, accounts, books, documents, films, tapes, and other forms of recordation, including but not limited to computer and recording devices, whether confidential or otherwise, that the legislative auditor has the right to inspect and examine, and
2. denied the legislative auditor access to the office, or to papers, accounts, books, documents, films, tapes, and other forms of recordation, including but not limited to computer and recording devices, whether confidential or otherwise, that he has the right to inspect or examine, and
3. refused, failed, or neglected to transmit to the legislative auditor reports, statements of accounts or other documents upon request as provided by law, and
4. obstructed or impeded, in any manner, the legislative auditor in making the examination authorized by law, and
5. failed to exercise diligence and care in preserving the public records of the Town of Jonesboro for the period or periods of time specified by law for such public records or not preserving- and maintaining those records for a period of at least three years from the date on which the public record was made, and
6. failed to establish and maintain an active continuing program for the economical and efficient management of the records of the Town of Jonesboro, and Count II: between January 2011 and June 2012, in violation of La. R.S. 14:67, La. R.S. 11:1751, and La. R.S. 11:1732(13) he misappropriated or took, with the intent to deprive permanently, a thing of value of a value of one thousand five hundred dollars or more, to-wit: public funds belonging to the Town of Jonesboro in the amount of $13,720.75, which belong to another, without the consent of the other to the misappropriation or taking, and by means of fraudulent conduct, practices, or representations, specifically by providing payments of public funds to the the [sic] Municipal Employees Retirement system for employees who were not actively employed on a permanent *149 regularly scheduled basis of at least thirty-five hours per week, and
Count III: between January 2011 and June 2012, in violation of, La. R.S. 14:68 he took or used, without the intent to deprive | spermanently, a movable, to-wit: public funds belonging to the Town of Jonesboro in the amount of $38,072.06, which belong to another, without the consent of the other to the taking or use, and by means of fraudulent conduct, practices, or representations, specifically by providing payments of public funds for Blue Cross Blue Shield of Louisiana insurance premiums for non-employees of the Town of Jonesboro.

404(B) Notice

On March 15, 2013, the state filed a La. C.E. art. 404(B) notice alleging that the following other crimes, wrongs and acts occurred during Defendant’s tenure as mayor:
1. Leslie C. Thompson, acting as may- or of the Town of Jonesboro, made no collection efforts on delinquent utility accounts as noted in the Town of Jones-boro Compliance Audit Issued June 1, 2011 filed in discovery on March 6, 2013.
2. Leslie C. Thompson, acting as may- or of the Town of Jonesboro, made no effort to- hold a tax sale for unpaid 2008 property- taxes as noted in the Town of Jonesboro Compliance Audit Issued June 1, 2011 filed in discovery on March 6, 2013.
3. Leslie C. Thompson, acting as may- or of the Town of Jonesboro, authorized extended payment terms for town residents of unpaid utility balances as noted in the Town of Jonesboro Compliance Audit Issued June 1, 2011 filed in discovery on March 6, 2013.
4. Leslie C. Thompson, acting as may- or of the Town of Jonesboro, participated in the sale and swapping of real estate without a proper appraisal or board approval as noted in the Town of Jonesboro Compliance Audit Issued June 1, 2011 filed in discovery on March 6, 2013.
5. Leslie C. Thompson, acting as may- or of the Town of Jonesboro, hosted an inauguration ceremony and paid for it with public funds as noted in the Town of Jonesboro Compliance Audit Issued June 1, 2011 filed in discovery on March 6, 2013.
6. Leslie C. Thompson, acting as may- or of the Town of Jonesboro, conducted the business and financial operations of the Town of Jonesboro with significant deficiencies including, noncompliance with audit law, noncompliance with the Local RGovernment Budget Act, noncompliance • with the Public Bid Law, lack of financial oversight, lack of accounting expertise, lack of adequate training on accounting system, accounting records in disarray and not complete, bank accounts not reconciled, no clear accounting of dedicated taxes, lack of control over payables and disbursements, customer utility accounts not reconciled, water meter deposits not reconciled, Ad valorem taxes not reconciled, written policies and procedures not complete, lack of control over capital assets, lack of controls over traffic tickets, and no disaster recovery/business continuity plan as noted in the Town of Jonesboro Compliance Audit Issued June 1, 2011 filed in discovery on March 6, 2013.
7. Leslie C. Thompson, acting as may- or of the Town of Jonesboro, mismanaged the operations of the town in such a way that resulted in the appointment of a Fiscal Administrator, Bill Ryder, as evidenced in Fiscal Administrator’s Progress Report As of the Close of Business on July 25 — October 8, 2012 filed in discovery on March 6, 2013.
*150 8. Leslie C. Thompson, acting as may- or of the Town of Jonesboro, paid full time benefits to non-full time employees of the Town of Jonesboro as noted in the attached documents as noted in the Investigative Audit issued March 13, 2013 filed in discovery on March 15, 2013.
9. Leslie C. Thompson, acting as may- or of the Town of Jonesboro made personal use of a town vehicle as noted in the Investigative Audit issued March 13, 2013 filed in discovery on March 15, 2013.
10. Leslie C. Thompson, acting as may- or of the Town of Jonesboro failed to make timely reimbursements for unused travel advances as noted in the Investigative Audit issued March 13, 2013 filed in discovery on March 15, 2013.
11. Leslie C. Thompson, acting as may- or of the Town of Jonesboro failed to remit unclaimed property to the State of, Louisiana as noted in the Investigative Audit issued March 13, 2013 filed in discovery on March 15, 2013.
On May 7, 2013, a hearing was held on the 404(B) notice. Kevin Kelley, an audit manager with the Louisiana Legislative Auditor’s (“LLA”) Office, testified about the first six alleged acts in the 404(B) notice, which | ¡¡resulted from a compliance audit on the Town that was issued on June 1, 2011, by the LLA. As to the first alleged act, Mr. Kelley stated that a large number of utility accounts were.uncollected, which left a substantial balance, and noted that Defendant had no knowledge of any collection efforts and was unaware of the uncollected balance. As to the second alleged act, Mr. Kelley testified that, as a result of the record-keeping problem, the Town could not identify who had and had not paid property taxes. Because of this uncertainty, the Town could not conduct a property tax sale. As to the third alleged act, he stated that Defendant established a program that extended payment terms for unpaid utility balances.. As to the fourth alleged act, Mr. Kelley noted that two appraisals were conducted on Town-owned property and that the board of aldermen accepted an offer, but that a different parcel of land was sold. As to the fifth alleged act, he testified that the auditors examined Town records, including bank statements and cancelled checks, regarding a mayoral election celebration party for Defendant. As to the sixth alleged act, Mr. Kelley stated that all of these allegations resulted from reviewing the Town’s records, noting the absence of records, and interviews with Town personnel.
William Ryder, the former fiscal administrator for the Town, testified about the seventh alleged act in the 404(B) notice. He stated that he was appointed by the trial court to investigate the Town’s financial activities and budget and that he undertook such tasks as ensuring bills were paid and helping prepare a budget.
|fiGreg Clapinski, an investigative audit manager with the LLA, testified about the last four allegations in the 404(B) notice, which resulted from an investigative audit of the Town that was issued on March 13, 2013, by the LLA. As to the eighth alleged act, he stated that the auditors reviewed personnel files, time sheets and payroll records and determined that non-full-time employees were receiving full-time employee benefits. He stated that they spoke to Defendant about the policy definitions of part-time employees and full-time employees. As to the ninth alleged act, Mr. Clapinski stated- that the auditors reviewed records of odometer readings and fuel consumption after receiving information that Defendant drove a Town vehicle to the Dallas area for his daughter’s wedding. Mr. Clapinski stated that the total use of the vehicle was approximately 35, 000 miles, but the auditors were only able *151 to confirm approximately 7,200 miles of actual documented business use. As to the tenth alleged act, he testified "that the auditors requested Defendant’s travel records and reviewed information regarding travel advances that Defendant received. Mr. Clapinski stated that Defendant reimbursed unused portions of travel advancements on an average of 143 days after the advancement was made. As to the eleventh alleged act, he testified that the Town did not report returned water deposits.
After the testimony of the witnesses, the trial court determined that the probative value “would certainly” outweigh any prejudice and, therefore, allowed each act alleged in the 404(B) notice to be introduced into evidence and made part of the record. On August 15, 2013, Defendant |7filed a' notice of intent to seek writs on the trial court’s ruling on the 404(B) evidence. On August 23, 2013, this court denied Defendant’s motion as untimely. State v. Mayor Leslie C. Thompson, 48,809-KW (La.App.2d Cir.8/23/13).

Defendant’s Motions to Quash

On March 20, 2013, Defendant filed a motion to quash in which he alleged that the state failed to file the bill of information within four years of the date of the offense, i.e., June 30, 2007, so Count I should be quashed.[1] On April 16, 2013, Defendant filed a second motion to quash in which he argued that La. R.S. 24:513 is unconstitutional, that it has too many parts for Defendant to determine which he is charged with violating and that it deals with the powers of the LLA rather than a mayor. On April 17, 2013, the state filed an objection and response to Defendant’s motion to quash. On May 7, 2013, a hearing was held on both of Defendant’s motions to quash,, and the trial court denied both motions. On August 15, 2013, Defendant filed a notice of intent to seek writs on the denial of his motions to quash. On August 23, 2013, this court denied Defendant’s writ .as untimely. State v. Mayor Leslie C. Thompson, 48,798-KW (La.App.2d Cir.8/23/13).
On August 26, 2013, Defendant filed a motion to quash alleging double jeopardy, contending that La. R.S. 14:134 and 24:518' carry penalties for the same conduct in the same count of the bill of information, which constituted double jeopardy and allowed double punishment for one crime. |sThe parties agreed that the penalties set forth in the statutes would not be included in the jury instructions. The trial court also denied this motion to quash.

Defendant’s Motion to Recuse Judge Teat

On March 20, 2013, Defendant filed a motion to recuse Judge Jimmy Teat as the trial judge in this case. He stated that Judge Teat presided over civil cases brought against him as mayor and against the Town, found that Defendant intentionally violated laws relating to the charges in the bill of information, had already adjudicated Defendant as guilty of a crime relating to the bill of information, would not be an impartial judge and had “personal animosity” toward Defendant.[2] On March 22, 2013, the state filed an objection and response to Defendant’s motion.
*152 On March 28, 2013, Judge Jenifer Cla-son[3] presided over a hearing on the motion to recuse Judge Teat. David Dill, the current Town clerk, testified about Judge Teat’s involvement in the Essmeier matter[4] and the appointment of a fiscal administrator. He also noted instances where Defendant was ordered by Judge Teat to produce documents.
Investigator Johnny Horton of the Jackson Parish Sheriffs ■ Department testified that he participated in the subpoena process in this |9case. He stated that the subpoenas were signed by an assistant district attorney and then sent to a judge for signature. Investigator Horton stated that he was not sure which judge signed the subpoenas, but some were signed by Judge Teat.
Judge Clason determined that Defendant did not meet his burden to overcome the presumption that the judge , is capable of fairness and impartiality and, citing jurisprudence and La. C. Cr. P. art. 674, denied Defendant’s motion to recuse. Defendant notified the trial court of his intent to seek writs on the denial of his motion to recuse Judge Teat. On May 7, 2013, this court denied the supervisory writ. State v. Mayor Leslie C. Thompson, 48,423-KW (La.App.2d Cir.5/7/13).

Defendant’s Motion for Security Measures

On August 23, 2013, Defendant filed a motion for certain measures for security and to assure a fair trial. He requested that the carrying of weapons “be limited to members of the sheriffs department skilled in courtroom security or to members of the FBI” and specifically stated that the district attorney and his staff should be prohibited from carrying weapons in the courtroom. Defendant further requested that “[a]ll persons who are not sheriffs deputies assigned to court security or persons with the Federal Government should be searched and dispossessed of all weapons before coming into court.” On August 26, 2013, the trial court granted the motion and further explained that metal detectors were installed so that anyone entering the courthouse, including lawyers, witnesses, spectators and news media, would have to pass through them. It also noted that the |inonly weapons deemed necessary to be carried in the courtroom are those carried by law enforcement officers.

Defendant’s Motion for a Sequestered Jury

On August 26, 2013, Defendant filed a motion for a sequestered jury pursuant to La. C. Cr. P. art. 791. He argued that, because of the small size of the community, it would be impossible for jurors not to hear or see something related to the trial if they were not sequestered. Defendant noted that the case involved the mayor of the largest town in Jackson Parish, that there had been pretrial publicity, that the issues in the case were of general concern to the community and that jurors could access information about the trial with their phones. The trial court addressed this motion on the day it was filed and took the matter under advisement during voir dire, noting that it would revisit the issue if needed depending on the potential ju *153 rors’ responses to questions. After the jury was seated, the trial court denied the motion to sequester the jury.

Jury Instructions

Defendant filed several motions regarding jury instructions. In the motion filed on August 23, 2013, he requested that the jury be instructed on the statutory duties of the municipal clerk as stated in La. R.S. 33:421. In the motion filed on August 26, 2013, he requested instructions regarding the defense of justification as stated in La. R.S. 14:18. On August 26, 2013, the trial court noted that a conference would be held on the jury instructions and deferred its ruling until after the proposed instructions were discussed.
| nVoir Dire, Batson Challenge, Motion to Change Venue
Jury selection began on the afternoon of August 26, 2013. Defendant objected to the state’s use of a PowerPoint slide displaying a photograph of Osama Bin Laden with the caption “Where’s Obama” and argued that it was prejudicial because Bin Laden “is considered as one of the most hated people in the United States after 911 especially.” The state responded that this slide is one in a series of slides used to demonstrate how the news media often makes mistakes. The trial court directed the prosecutor to move on to another slide. The state then showed slides of additional news stories that include erroneous information, e.g., a map that labeled Tripoli as a city in the Middle East when it is, in fact, located in Northern Africa, and explained to the potential jurors that they should disclose if they had heard something in the news media about the case at issue but should not state what they had heard because the information may be incorrect. Throughout voir dire both parties asked questions about the issue of race, whether a defendant or witness’s race should be a factor and what the potential jurors thought about the issue of race regarding the case of George Zimmerman and Tray-von Martin.[5]
Of the 12 potential jurors on the first panel, 7 were dismissed by the trial court on challenges for cause. Of those 5 remaining potential jurors, the defense released one by using one of its peremptory challenges. Of the 12 potential jurors on the second panel, 5 were challenged for cause, and the h {.trial court granted four of the challenges. The state used a peremptory challenge on the one potential juror for whom the trial court did not grant the challenge for cause. The defense objected to the state’s use of this peremptory challenge and raised a Batson challenge, alleging that the state dismissed the juror because the he/she is African-American. The defense noted that all African-American potential jurors had been eliminated from the jury pool by challenges for cause and the one peremptory challenge exercised by the state. Defendant contended that it was nearly impossible for him as an African-American to be represented by a jury of his peers because the African-Americans in the community knew Defendant and, therefore, would be challenged for cause. The defense also argued that the state had not used any peremptory challenges on Caucasian jurors who knew Defendant, but the state and the trial court noted that' none of the other potential jurors said they were friends with Defendant. The state argued that the defense had not made a prima facie showing of a race-based challenge based on the state’s use of one peremptory challenge.
*154 The trial court stated that, while the challenged juror’s long-term relationship with Defendant was not by itself enough to support a challenge for cause, the juror had also said that he wanted to hear both sides of the case, even though Defendant was not required to put on a defense, and made comments that he had personally suffered prejudice due to his race. The trial court denied Defendant’s motion, finding that the state’s use of one peremptory challenge was not enough to demon-straté that the peremptory challenge was specifically directed at a member of a cognizable group. It 1 iSnoted that both parties had remaining peremptory challenges and stated that, if the remaining potential jurors on the panel were not selected, another panel of potential jurors would be brought in for questioning, which might make the issue moot.
After the argument on the Batson challenge, Defendant used two of his peremptory challenges to strike back a juror from the first panel and a juror from the second panel. Neither party used all of its peremptory challenges, and a jury was able to be chosen from the first two panels-a third panel of potential jurors was not needed. A jury of six persons and one alternate was seated on August 28, 2013.
On August 28, 2013, Defendant objected to Investigator Horton, the chief investigating officer and case agent, serving as a bailiff in the courtroom during the trial. The state noted that it did not intend to call Investigator Horton as a witness and agreed that he should not serve as a bailiff in this case.
On August 29, 2013, Defendant filed a motion to change venue, arguing undue influence in the community because of media and pretrial publicity preventing him from receiving a fair and impartial trial in Jackson Parish. The trial court denied this motion because it was raised after a jury had been selected.

Trial on the Merits

Testimony began on August 29, 2013. Andy Brown, Sheriff of Jackson Parish, testified that, in October 2012, he was contacted by the Town’s fiscal administrator about concerns that benefits, including Blue | ,4Cross Blue Shield (“BCBS”) health insurance and Municipal Employee Retirement System (“MERS”) retirement benefits, were being paid by the Town to employees who were not eligible for those benefits. He stated that he also investigated information provided by the LLA and looked into citizen complaints about undeposited funds and property being sold for less than the approved price. Sheriff Brown stated that, based on the information gathered during the investigation, his office contacted the district attorney’s office, which then issued a warrant for Defendant’s arrest for three counts of malfeasance in office.
Count I
Daryl Purpera, the Louisiana Legislative Auditor, testified that all government bodies are required to report their financial conditions annually. He stated that entities that have more than $500,000 in annual revenues are required to hire an independent certified public accountant (“CPA”) to conduct auditing procedures and prepare an audit report. He noted that the Town is such an entity that requires an annual audit. Mr. Purpera testified that the CPAs hired to conduct audits for the fiscal years ending on June 30, 2008, 2009, 2010, 2011 and 2012, were unable to form opinions on the Town’s financial situation and, therefore, issued disclaimers for those -five consecutive years. Mr. Purpera stated that his office also conducted a compliance audit dated June 1, 2011, and an investigative audit dated *155 March 13, 2013, on the Town.[6] He explained that compliance/investigative audits are performed when the LLA receives an allegation of a [^misappropriation or illegal violation, and his office responds by sending auditors to act as fact finders to prove or disprove the alleged violations.

2008 Independent Auditor’s Report

Kenneth- Folden, CPA, testified that he works at a local accounting firm and conducted audits for the Town from 1987 to 2008. He noted that the audit for the year before Defendant assumed office had no disclaimer. He described differences between audits conducted for the previous mayoral administration, noting that the staff had years of experience, was familiar with the computer accounting system, kept thorough and well-organized records and that the clerk had “every level of training.” Mr. Folden further stated that, after Defendant took office, the.bank account was out of balance; documents, e.g., bank reconciliations, invoices and disbursements, could not be found; and checks were not properly documented.
Mr. Folden also testified about the Independent Auditor’s Report for 2008 that he prepared. He explained that he gave a disclaimer of opinion in the report, which stated:
We were unable to obtain written representations from the Town’s management or a legal representation letter from the Town’s counsel as required by generally accepted auditing standards.
The Town did not maintain adequate records of disbursements, properly reconcile bank accounts or accounts receivables or payable, nor were all transactions entered into' the accounting records. The Town’s records do not permit the application of adequate auditing procedures. Because of the limitations described
above we are unable to express; and do not express, an opinion on the Town’s financial statements as listed in the table of contents.
lifiMr. Folden noted that over $1,000,000 of transactions had not been entered into the accounting records; that water and sewer funds were not reconciled; that accounts payable were not reconciled; that the fire department' was not properly billed for services of a firefighter; and that bills were not timely paid, which resulted in the Town being charged penalties and in services being discontinued. He explained that original invoices were not available and that unauthorized parties signed invoices.
Mr. Folden also stated that he spoke with Defendant on at least a weekly basis about the problems he was encountering with the audit. He testified that Defendant submitted a letter in response to these findings in which he placed blame on having an inexperienced staff and indicated that the Town planned to acquire new software.

2009 Annual Financial Report and 2010 Annual Financial Report

Margie Williamson, CPA, testified that she attempted to complete audits for the Town for the fiscal years ending June 30, 2009, and June 30, 2010. She stated that there was a disclaimer for the 2009 fiscal year, and the report stated:
The Town did not maintain adequate records of disbursements, properly reconcile bank accounts or accounts receivable or payable, nor were all transactions entered into the accounting *156 records. The Town’s records did not permit the application of adequate auditing procedures.
Because of the scope limitation described above we are unable to express, and do not express, an opinion on the Town’s financial statements as listed in the table of contents.
Ms. Williamson testified that bank accounts were not reconciled timely and that there were 300 outstanding checks over one year old; the Town could |17not provide a listing'of grants received; vendor payments were often made late, including payroll deductions; the federal income tax was not paid timely; the Christmas Club deductions were not transferred to employees’ accounts; the group health insurance was not paid timely and was cancelled twice for nonpayment; customers’ payments for water and sewer were not timely posted to their accounts; there was no control over the ticket books issued to police officers and fines were not timely deposited; the ad valorem tax bills contained information for the incorrect tax year and a second billing had to be mailed to all customers; the tax sale of property for unpaid taxes was not held because the property tax records were unreliable; and the Town could not provide credit card statements and invoices for four or five months.
Ms. Williamson also testified that there was a disclaimer for the 2010 fiscal year, and the report stated:
The Town did not maintain adequate records of receipts and disbursements, properly reconcile bank accounts or accounts receivable or payable, nor were all transactions entered into accounting records. The Town’s records did not permit the application of adequate auditing procedures.
Because of the scope limitation described above we are unable to express, and do not express, an opinion on the Town’s financial statements as listed in the table of contents.
She noted that checks were not issued in number order and there was no accounting for the sequence of check numbers; numerous checks and deposits were never recorded or were recorded in the wrong account; the reconciliation for the control account included outstanding checks that were written from other accounts; five cash accounts had no activity recorded 1 iseven though there was activity; police fines, ad valorem receipts and water receipts were deposited late; petty cash transactions were not posted; grant checks were not recorded; time records were not signed by employees and supervisors; and three months of credit card statements could not be found.

Noncompliance List

Mr. Purpera testified that, in July 2009, his office was alerted to the need for a compliance audit when Mr. Folden submitted a disclaimer of opinion stating that he was unable to complete an audit for the fiscal year ending on June 30, 2008. He stated that, during the years of 2009 to 2012, both the Legislative Auditor Advisory Council and the Fiscal Review Committee worked with the Town to help it become financially accountable and transparent and to make recommendations to correct deficiencies.[7] He further stated that the advisory group and compliance and investigative audit sections of the LLA made multiple trips to the Town *157 in order to conduct the audit and offer assistance.
Mr. Purpera also testified that, pursuant to state audit laws, audits are due six months after the end of the fiscal year. He stated that the Town requested numerous extensions to file its annual audits. Because of the Town’s failure to prepare its audits timely, it was placed on the noncompliance list, the consequence of which was that state funds could not be disbursed to the Town by the state treasurer. Specifically, he stated that the state treasurer could not release funds for the Town’s airport project or 119its community grants that provided citizen services. Mr. Purpera noted that, as of the date of trial, the Town was still in violation of the state audit laws and remained on the noncompliance list.

June 1, 2011 Compliance Audit

Mr. Kelley and Kunta Osberry, auditors with the LLA office, testified about their work on the June 2011 compliance audit and the findings listed in the report. Mr. Kelley stated that the auditors reviewed approximately 435 expenditures, totaling approximately $1,100,000, but were unable to find documentation for 172 of these expenditures, totaling approximately $385,000. Mr. Osberry stated that they gave the Town a list of the undocumented expenses and requested that it supply those documents, but it failed to do so. Mr. Kelley and Mr. Osberry testified that days before trial, the defense provided documents that were allegedly those requested by the LLA. Mr. Kelley noted that the third-party invoices provided by the defense were suspicious because they appeared to be in an identical format and did not include information normally found on invoices, such as business name, address, phone number, email or contact information. Mr. Osberry stated that the invoices were on the same form even though they were from different individuals. He noted that, after receiving these documents, 75 requested documents were still outstanding.
Mr. Kelley noted that the records were generally disorganized and that there were stacks of documents. Mr. Osberry stated that some of the boxes of documents were “fairly organized [by] vendors, month,” but others were not. He also testified that one clerk’s office had unorganized papers 12nand records scattered on the floor, on the desk and in filing cabinets. He further noted, that a formal record retention policy did not appear to be in place.
Mr. Kelley testified that the collections of utility accounts were past due by more than 30 days and amounted to $178,000. He stated that, in 59 instances, property taxes amounting to $2,890 also went uncollected for a year. Mr. Osberry stated that some payments of property taxes were not posted to the accounting system; and, as a result, individuals received delinquency notices even though they had paid. He further stated that, because the Town could not determine who had actually paid their property taxes, it did not hold, a property tax sale. He also noted that Defendant was aware of these problems as they had three formal interviews, as -well as informal discussions, with him.
Mr. Kelley and Mr. Osberry also testified about a gospel concert organized by the Town. They stated that Defendant, his wife and Town employees collected cash from ticket sales, but did not keep records about who collected funds, how much money was collected, or how many and at what price the tickets were sold. Mr. Osberry added that, because of a lack of documentation, they could not verify that the money deposited was the actual amount collected.
Mr. Kelley and Mr. Osberry further testified about a land transaction that was not *158 approved by the board of aldermen. They stated that the board had two appraisals conducted on a piece of land and approved one of the appraisals, but a different piece of land was sold at a different price than that approved. Douglas Stokes,[8] attorney for the Town, testified that, after the transaction had taken place, he was notified by an alderman that the transaction was not authorized. He stated that, after negotiations, the Town and the purchaser agreed to nullify the transaction and start anew.
Mr. Kelley -and Mr. Osberry also testified about an inauguration ceremony held in honor of Defendant as mayor, the chief, of police and the board of aldermen that was paid for with Town funds. Mr. Kelley stated that the Town spent $2,400 on catered meals and $158 to advertise in the newspaper.[9] Mr. Osberry stated that the compliance report references an attorney general opinion which states that public funds should not be used to pay for an inauguration.
Sandra Whitehead, an auditor in the advisory services section of the LLA, testified that advisory services provides training and performs assessments. She stated that one of her duties was to help the Town reconcile its bank account, which had not been reconciled for four years, and noted that she had to make an adjustment of $3.6 million dollars. Ms. Whitehead testified that, for the fiscal years of 2007 through 2010, the Town did not timely file its annual audit reports, resulting in its being ineligible to receive state funds. She also stated that the Local Government Budget Act requires all local government agencies to have their budget in place before the start of the fiscal year, but the Town had not passed a budget. She testified that the Town was not in compliance with the PublicJjjBid Law, which requires competitive bids or quotes for all purchases of materials and supplies exceeding $30,000. She noted that the Town’s board of aldermen was not receiving financial statements on a monthly basis. She stated that the Town was transitioning between accounting systems, but noted that the staff was not adequately trained on the new accounting system. Ms. Whitehead noted a lack of financial accounting expertise on the part of the Town staff and stated that the Town did not keep up with its receivables, its payables and the bank reconciliations, which resulted in its first two disclaimers. She stated that accounting records were in disarray and were not complete. She compared the book balance to the bank balance, noting that the book balance was $4,375,699 and the bank balance was $796,116-a difference of $3,579,583. She also discussed the payroll bank account, which showed a difference of $93,361 between the book balance and the bank balance. She noted that there was no clear accounting of dedicated taxes, e.g., property taxes and ad valorem taxes, and that utility accounts were not reconciled. Ms. Whitehead further stated that management did not know the full extent of the Town’s unpaid obligations and that bills were not being paid on a timely basis. She had to contact third-party vendors because of missing documentation.
Ms. Whitehead also stated that the auditors gave both written and verbal recommendations to the Town. She testified that the Town’s accounting records were the root of its problems, which she described *159 as incomplete, in disarray, disorganized and “a train wreck.”
[^Defendant submitted a response to the June 2011 compliance audit and stated that a new in-house accountant and an external CPA had been hired to resolve the financial problems, that a new accounting program was being installed and that he addressed the utility accounts problem with the Town’s attorney.
Tonya Wade, CPA, testified that she began working for the Town in 2010 to assist with bank reconciliations and to. set up schedules for the auditors. She stated that, in April 2011, she signed a contract with the LLA and the Town to serve as chief financial officer and to perform 24 steps to help the Town with its general ledgers, policies and procedures. Those 24 items included entering all current-year transactions into Quickbooks (accounting software), creating a filing system, determining what bills to pay and how to prepare reconciliations in order to print a financial statement. She further stated that she assisted the Town in creating procedures for dedicated taxes; trained the clerks on Quickbooks; taught employees how to enter the bills and checks into the system and how to pay bills and make deposits; helped reconcile the utility accounts and ad valorem tax accouñts; and helped create new policies and procedures relating to the accounting and fiscal offices.
Ms. Wade also testified that the number of hours worked per week by employees and their status as full-time or part-time were also issues. She stated that, in response, the Town began to keep track of each employee’s weekly hours.
IímMs. Wade further stated that, while working on the contract, she met with Defendant to update him on the progress and noted that he was cooperative. She described one clerk’s office as messy, but stated other clerks had neat offices. She also noted that she had problems receiving documents she requested from the Town and usually had to ask more than once. She testified that her contract ended at the end of November 2011.

2011 Annual Financial Report■ and 2012 Annual Financial Report

Jonald Walker, CPA, testified that his firm performed the audits for the Town for the fiscal years ending June 30, 2011, and June 80, 2012. He stated that there was a disclaimer for the 2011 fiscal year, and the report stated:
Because of inadequacies in the Town’s accounting records, we were unable to form an opinion regarding the amounts recorded as opening balances for liabilities and fixed assets and the income and expense or expenditure allocation between departments and funds[.]
Because of the scope limitation described above we are unable to express, and do not express an opinion on the Town’s financial statements as listed in the table of contents[.]
He noted that the Town had problems with its general accounting; no documentation was provided for some checks; some purchase orders could not be provided and others were postdated; and numerous checks were paid more than 30 days after the invoice date. He also stated that monthly financial statements were not provided to Defendant as mayor or to the Town’s board of aldermen for use in financial decisionmaking.
Mr. Walker also discussed the 2012 report and noted that there was a disclaimer that stated:
^Because of inadequacies in the Town’s accounting records, we were unable to form an opinion regarding the amounts recorded as opening balances. The Town’s accounting pérsonnel did not *160 possess sufficient knowledge and skills in financial reporting resulting in numerous misstatements in the Town’s computerized accounting system. We were unable to confirm or verify by al-terative means accounts payable and other payables of the Town. As of the date of our audit report, management was still in' the process of rectifying issues with its financial reporting and correcting the misstatements. As a result of these matters, we were unable to determine whether any adjustments might have been found necessary in respect of recorded or unrecorded receivables, payables and other liabilities, and the elements making up the statements of revenues, expenditures, and changes in fund balances.
Because of the significance of the matters described in the paragraph above, we have not been able to obtain sufficient appropriate audit evidence to provide a basis for an audit opinion. Accordingly, we do not express an opinion on these financial statements. minated employees without collecting reimbursement from the. individuals for the coverage.
He stated that documentation for transactions was not available; transactions between funds were incomplete; the petty cash account was not reconciled; checks were written out of numerical order; traffic tickets were not properly reported, maintained or collected; and water and sewer billings were not properly collected. He also testified that the Town improperly paid retirement contributions, insurance benefits and other employee benefits for ineligible employees. He reviewed payroll records and benefits received by Town employees to determine whether they were entitled to the benefits they received. He stated that he found instances where, under the Town’s policy, the Town was paying benefits to employees who did not meet the full-time criteria. Mr. Walker also noted that the Town made payments for health insurance coverage for five ter-

\2ryAppointment of Fiscal Administrator

Mr. Purpera testified that, based on the continuing problems with the Town, i.e., disclaimers of opinion, the inability to audit and the inadequate records, the Fiscal Review Committee unanimously voted to request that the district court appoint William Ryder as fiscal administrator, and Judge Teat ordered the appointment.
Mr. Ryder testified that he served as fiscal administrator from July 25 to October 18, 2012. He stated that, before he arrived in the Town, he received documents regarding its financial situation and found there was no current-year financial statement, there were many negative balances, the general fund was $600,000 short on collections, the budget was overspent by $660,000, there was a shortfall of approximately $1,000,000 in the general fund, bills were paid late and expenditures were inadequately documented.
Mr. Ryder stated that, on his first day in the Town, he met with Defendant, who asked him if he (Mr. Ryder) was going to follow the court order or the law. Mr. Ryder stated that he told Defendant the court order was the law and that it “went downhill from there.” He noted that Defendant was uncooperative, was never at Town Hall, would not respond to emails or phone calls, would not show up for meetings and cancelled 12 meetings. Mr. Ryder added that Defendant insisted that all of Mr. Ryder’s requests be brought to him first before the staff responded.
Mr. Ryder stated that Defendant wanted to wait two weeks to advertise the positions of Town clerk, and accountant. He told Defendant 127that he could not wait *161 two weeks and hired Sharetha Houston, the Town’s former accountant.
Mr. Ryder testified that he observed that Town employees did not keep a set work schedule and that Melba Holland, a previous Town clerk, had complained to Defendant about employees not working set schedules. He stated' that, although employees were required to clock in and out, the clocks were tampered with by Mr. Dill, the Town clerk.
Mr. Ryder further testified that he became aware of six employees who were not working full-time hours, but who were receiving full-time employee benefits. He stated that the Town policy and the statute defining MERS retirement eligibility defined a full-time employee as one who consistently works 35 hours per week. He reviewed approximately one year of payroll summaries for these six employees and discovered they were not working full-time hours, even when taking into account sick leave days, holidays, vacation days or paid personal days, but were receiving all full-time employee benefits, including holiday pay, retirement contributions and insurance premiums. He also testified that he notified Defendant of the problem and Defendant responded that he (Defendant) and the employees’ supervisors got to decide who was part time and who was full time. Mr. Ryder stated he explained to Defendant that he was not going to pay the employer portion for part-time employees, and he contacted MERS regarding the violation of state law.
Mr. Ryder testified that he was not receiving the information from Defendant that he needed to do his job and ended his relationship with theJ^Town when he believed he was no longer beneficial to it. He stated that he made reports to the LLA and the district court and also contacted Sheriff Brown.

March 13, 2013 Investigative Audit

Because of the continuing financial problems of the Town, Mr. Purpera testified that, in 2012, he sent a team of auditors to the Town to conduct an investigative audit. Mr. Clapinski testified about the March 13, 2013 investigative audit. He noted that the Town did not comply with state audit laws in that it was unable to get an opinion based on its financial' statements from 2008 to 2011; that it did not comply with the Local Government Budget Act; that it improperly provided insurance and other employee benefits to ineligible individuals; and it failed to remit unclaimed property to the State of Louisiana.
Mr. Clapinski stated that Defendant used a Town vehicle for his personal use. He further stated that the auditors examined records, including odometer readings, travel records and reimbursement records, and calculated Defendant’s usage of the vehicle from September 2010 to September 2012. The March 2013 report states that the records provided by the Town only supported a public purpose for 20 percent of the mileage incurred, that Defendant and other Town employees did not complete daily mileage logs and that Defendant drove the Town vehicle without a logo bearing the Town’s name on the vehicle. Mr. Clapinski also testified that Defendant failed to timely reimburse the Town for unused travel advances for the period of September 2010 to September 2011. The report states that [Mthe Town issued eight travel advance payments to Defendant totaling $4,050 but that he failed to timely reimburse the Town $2,970 for unused portions of the advances, which may have resulted in illegal loans.
Calvin Moore, an investigative auditor with the LLA’s Office, also testified about the findings regarding ineligible employees receiving benefits. His testimony corroborated that of Mr. Clapinski and added that *162 the investigation was difficult because of the chaotic state of the Town’s records.

Counts II and III

Mr. Clapinski testified that, as part of the investigative audit, the auditors reviewed information provided by Mr. Ryder that Town employees who were working part-time hours were receiving full-time employee benefits, specifically, MERS retirement benefits and BCBS health insurance benefits. He-stated that he contacted MERS and matched employee earnings and contributions reports with checks that the Town issued to MERS. The checks were dual signature and' Defendant had signed each one. He also determined that, from January 2011 to June 2012, the Town improperly used public funds totaling $13,721 to pay the employer portion of retirement contributions for ineligible employees. Mr. Clapinski further testified that he also looked at the amounts the Town paid for insurance for part-time employees, for leave benefits for part-time employees and for insurance benefits provided for former employees and determined that, from January 2011 to June 2012, the Town paid $26,918 in insurance premiums and $9,179 in leave benefits for ineligible employees. He also stated that laothe Town paid $38,072 in insurance premiums for former employees and officials.
Mr. Moore stated that he met with Defendant to discuss the Town’s compliance with its policy on part-time' and full-time hours. Its policy defines a full-time employee as one who “consistently work[s] more than 35 hours per week.” Mr. Moore noted that Defendant was concerned about the term “consistently” in the policy, and Defendant informed him that he was who decided who was a part-time employee and who was a full-time employee.
Melba Holland,[10] a previous office manager. and Town clerk, testified that she noticed some employees were not working full-time, regularly scheduled hours each week. She stated that she alerted Defen-’ dant about the problem and Defendant responded that he would handle it. She also stated that, despite her reminders to Defendant, the problem was not remedied, and employees continued to work irregular hours. Ms. Holland further testified that one of her duties was to pay the BCBS bill. She stated that she informed Defendant she was having trouble cancelling the policies of ineligible employees, explaining that the Town had to continue to pay the total premium, which included the ineligible employees, because not paying the total would result in the cancellation of everyone’s insurance. She also stated that Defendant did not do anything to attempt to cancel the BCBS policies for ineligible employees.
|s1Sharetha Houston, a former Town accountant, testified that she was terminated by Defendant because he requested her, as the person in charge of payroll, to pay holiday benefits for some part-time employees as if they were full-time employees even though they did not meet the Town policy’s definition of full-time employee. She stated that Defendant pronounced himself as the one who decided which employees were full time and which were part time. Ms. Houston also testified that she noticed some of the employees listed on the BCBS bill were not Town employees. She stated that Defendant was very seldom at work and did not seem to be concerned about office issues.
*163 Earline Knox, Defendant’s former administrative assistant from 2007 to 2010, disputed Ms. Houston’s testimony and stated that Defendant was regularly at work and helped her secure grants for the Town. She stated that she was hired in 2011 to help the legislative auditors. She blamed Ms. Houston for many of the accounting problems, stating that Ms. Houston destroyed the system and records.
Mr. Stokes testified that he gave advice to Mr. Ryder about how to define “consistently” and how to determine who is entitled to benefits. He stated that his opinion was not about MERS and noted that he and Mr. Ryder did not discuss MERS. Mr. Stokes did state that he discussed MERS with Defendant and that he wrote a letter to MERS stating Defendant’s position.
Kanesha Raybon, the human resources director for the Town, testified that she was hired as a full-time employee; that she is entitled to receive | ^retirement benefits, BCBS insurance and leave time; and .that her regularly scheduled hours are 8:00 a.m. to 5:00 p.m. She stated that Mr. Ryder and Ms. Houston informed her she was considered a part-time employee because she had not worked 35 hours per week and that she filled out a MERS form for a refund. She explained that she has been reinstated as a full-time employee.
Robert Rust, the executive director of MERS, testified that MERS is a voluntary system for all the cities, towns and villages in the State of Louisiana to provide retirement benefits for their workers. He explained that once a municipality béeomes a member of the system, it must follow statutory rules, i.e., that all regularly scheduled employees who work 35 hours per week and are permanent employees must be members of the retirement system.
Susita Suire, an administrative assistant for MERS, testified that, when someone seeks a refund, he receives a refund of his own contributions and explained the employer’s contribution is never refunded.
Denise Akers, former general counsel for MERS, testified that she communicated with Mr. Ryder about a hypothetical situation he posed regarding employees who had been contributing to the retirement system but may not have met the legal eligibility requirements. She stated that, when he sent her documentation concerning six employees, she responded by providing him with the MERS policy. Ms. Akers testified that she also communicated with Defendant through Mr. Dill about the hypothetical posed by Mr. Ryder and that Defendant sent her a chart with employee 1 ^information. She noted that she responded that she would not interpret the chart and requested that Defendant tell MERS which employees had a break in service. She stated that MERS never determined which of the Town employees were full or part time and that MERS left that determination to 'the Town.
Dawn Williams, an automated enrollment specialist in membership and billing at BCBS, testified about the members’ coverage cancellation process, explaining that, to cancel a particular employee of the group, a cancellation form would have to be filled out and submitted to BCBS within 30 days of the employee’s termination for BCBS to end coverage at the end of the billing cycle. She noted that, if the form is submitted more than 30 days from termination, BCBS will terminate coverage at the end of that billing cycle and not retroactive to the date of termination of the employee.

Defendant’s Motion for Mistrial

During the testimony of Mr. Purpera, Defendant made a motion for mistrial based on a statement regarding race made by the prosecutor. The prosecutor at *164 tempted to respond to the defense’s implication that the- investigations were instigated by claims from people upset that Defendant won the mayor’s race. In the presence of the jury, the. prosecutor stated in a question to Mr. Purpera that “there’s been an allegation made ... [that] the Mayor has been harried by various conservative and or white people.” The defense objected to this statement, noting that defense counsel never used those terms to refer to Defendant’s detractors. Defendant then moved for a mistrial on the ground that the prosecutor was injecting race into the | ^proceedings. The trial court overruled the objection and the motion for mistrial because the defense raised the issue of race during voir dire and during opening statements.
On September 8, 2013, Defendant filed a motion for mistrial in which he alleged that “the effort to keep race from being a factor in this trial has failed.” Defendant stated that, during jury selection,. both parties questioned the potential jurors about the issue of race. He noted his objection to the state’s use of a photo of Osama Bin Laden. He also discussed how several potential jurors admitted that they were uncomfortable serving on this jury because of uneasiness about how the divided community would react to the jury’s verdict, whether guilty or not guilty. Defendant also noted the prosecutor’s mention of “white people” in the presence of the jury and how this remark about race was grounds for a mistrial pursuant to La. C. Cr. P. art. 770. The parties argued this motion on the record, and the trial court denied the motion.
On September 4, 2013, Defendant filed a notice of intention to seek writs on the trial court’s denial of his motion for mistrial. On September 6, 2013, he filed a motion for stay, and the trial court denied the stay. On September 11, 2013, this court found “no palpable error” in the trial court’s denial of Defendant’s motion for mistrial, stated that Defendant has an adequate remedy on appeal and noted that the motion to stay was moot. State v. Leslie C. Thompson, 48,848-KW (La.App.2d Cir.9/11/13).
[ ^Conviction
On September 11, 2013, a jury unanimously found Defendant guilty as charged of all three counts of malfeasance in office.

Bail Revocation

Immediately after Defendant’s conviction, the trial court ordered that Defendant post an appeal bond of $15,000, i.e., $5,000 for each count, and remanded Defendant to the custody of the sheriff until posting bond.
On September 19, 2013, the state filed a motion to hold Defendant without bail pending formal sentencing. The state noted that, upon conviction, Defendant was automatically suspended from public office by operation of law, but that, on September 16, 2013, he attended a board of aider-men meeting and attempted to have his wife installed as interim mayor. The state contended that Defendant’s actions were an attempt to usurp a public office and presented an imminent danger to the community. On September 19, 2013, Judge Clason signed an order directing law enforcement to arrest Defendant and immediately take him into custody and ordered that he be held without bond.
On September 23, 2013, Defendant filed a motion for release. He noted that the statute the state cited regarding his automatic suspension from office has been repealed and contended that Judge Clason did not have the power or authority to hold him without bail without a contradictory hearing. He stated that La. C. Cr. P. art. 330.1 does not apply to the situation where bond has been set after a trial. He also *165 argued that it was not illegal for him to request that the board of aldermen appoint his wife as interim mayor.
IsfiOn September 23, 2013, a hearing was held on the state’s motion to hold Defendant without bail pending formal sentencing. The state argued that La. R.S. 42:1411 has not been repealed, noting that there was a typo in their motion, and that La. C. Cr. P. art. 330.1 applies.
Renee Stringer, a Town alderman, testified that a special meeting was held on September 16, 2013, for the purpose of filling the vacancy of the position of mayor. She noted that Defendant was present at this meeting and that he addressed the crowd and stated that he was still mayor and that he had to operate within the confines of his current situation. She testified that he made statements about his wife and that he would send information through her to the fiscal administrator. Alderman Stringer noted that Defendant also addressed the aldermen, telling them they had responsibilities, they had to do what they believed they should do and they were required to vote according to what their constituents expected them to do. She testified that a vote was conducted at the meeting as to Mrs. Thompson and that Aldermen Flowers, Melton and Cottonham voted in favor of Mrs. Thompson’s appointment as interim mayor, and she (Alderman Stringer) voted against it. She noted that Mr. Folden, the current fiscal administrator, was present at the meeting and would not accept the recommendation based on the statute and his responsibility to adhere to it. She stated that no other nominations were made. Alderman Stringer further noted that the atmosphere was angry. She stated that Alderman Melton questioned, “What do we do?” and that Defendant gave a “dissertation” on |S7the process to follow and stated that he was still the mayor. She noted that his comments were made after the point on the agenda for public comments.
Mr. Folden testified about the board of aldermen meeting on September 16, 2013, and noted that Defendant was present at this meeting and addressed the aldermen and the public. He stated that Defendant advised the aldermen on what they should do concerning the vote and the appointment of an interim mayor and that he instructed them to do what they believed was right and then let the courts deal with it. He further stated that Defendant also made a statement on television, in which he suggested that Mrs. Thompson would be the best person to serve as interim mayor because she could pass information from Defendant to Mr. Folden. He stated that he did not accept the nomination of Mrs. Thompson, which was within his discretion as fiscal administrator.
Ann Walsworth, the Jackson Parish Clerk of Court, testified that, on September 18, 2013, she met with Alderman Flowers and Mrs. Thompson. She stated that Alderman Flowers requested that she swear in Mrs. Thompson as mayor. Clerk Walsworth informed them she could not swear in Mrs. Thompson because the fiscal administrator had not approved the appointment.
Defendant testified that he attended the board of aldermen meeting on September 16, 2013, and that the aldermen allowed him to address them concerning the appointment of an interim mayor. He stated that his wife would be a good choice because she had direct access to him and his own experiences as mayor, which would, in turn, be helpful to the fiscal [.^administrator. He also noted a custom in the Town for a wife to fill her husband’s position. He stated that Mr. Stokes also spoke at the meeting and gave his “guesst-imation” on the procedure and that it was Alderman Flowers’s suggestion that he *166 recommend his wife. He further stated that Mr. Stokes told him that he was still the mayor, but was suspended, meaning he could not receive compensation. Defendant noted that he was never told he could not go to town hall or to a board of aider-men meeting and that, since his conviction, he had not performed any official duty as mayor.
The parties stipulated. to Mr. Stokes’s “guesstimation” on the law, summarizing that it is the fiscal administrator who has the last say regarding the powers and duties of the board of aldermen and the mayor.
The trial court took the matter under advisement, and both parties filed post-hearing memoranda.
On September 24, 2013, the trial court filed reasons for judgment and ordered that Defendant’s bond be revoked and that he remain in jail pending formal sentencing. The trial court noted that “it appears that there is a possibility if not a probability that the defendant herein while out on bond has committed another criminal act which would be a violation of his bond,” i.e., usurpation of office. The trial court further stated that, if it did not revoke his bond, Defendant “would continue to flagrantly disregard the law and would continue to make every effort to ‘meddle’ into the affairs of the Town of Jonesboro to the point where the fiscal administrator would be prohibited from doing his job that he has been appointed to do.”
139Following the hearing, Judge Teat denied the motion for Defendant’s immediate release from custody. On September 30, 2013, Defendant filed a notice of intent to apply for expedited writs and requested a stay of the trial court’s ruling and for release upon posting bail pending the writ and sentencing. On October 9, 2013, this court denied the writ and ordered that a sentencing hearing commence within ten days of the date of the order.[11] State v. Leslie C. Thompson, 48,916-KW (La.App.2d Cir.10/9/13).

Motion for New Trial

On September 26, 2013, Defendant filed a motion for new trial and motion in arrest of judgment. Defendant argued that the verdict was contrary to the law, i.e., La. C. Cr. P. art. 851, and evidence because all of the auditors testified that Defendant allowed them access to the office, papers, accounts and whatever they wanted to examine. Defendant stated that he could not be subjected to the penalties under La. R.S. 14:134 in Count 1 because La. R.S. 24:518, if applicable, prescribes only a penalty of no more than six months and is the specific statute rather than the general. He further alleged that the trial court’s rulings on objections during the proceedings showed prejudicial error because the court allowed the prosecutor to argue far outside the scope of an opening statement and a closing argument. Defendant further noted the racial divide among those sitting in the courtroom, that Count 1 charged him with two crimes at the|4nsame time and that information on the Internet regarding the prosecutor created a poisonous atmosphere in the court and the Town.
*167 On October 17, 2013, a hearing was held on Defendant’s motion for new trial. After arguments from both parties, the trial court denied the motion.

Sentencing

On October 17, 2013, a sentencing hearing was held. The defense objected to portions of the presentenee investigation (“PSI”), including language about violating bond and a conviction for forcefully pushing Alderman Stringer from a chair.
Both parties presented arguments regarding the La. C. Cr. P. art. 894.1 factors. The defense presented the following mitigating factors: that Defendant has been very remorseful; he has led a law-abiding life; he is not going to pose a danger to society or an undue risk during the period of a suspended sentence or probation and is not going to commit a crime; he is a nonviolent person and the offense for which he was convicted is a nonviolent crime; he is a responsible family man and putting him in prison will create an undue hardship on his family and himself; he is a Christian and attends church; he has strong family and community support; and none of the counts in the bill of information allege that he received a personal benefit. The defense requested leniency, that Defendant’s sentence be suspended and that he be placed on probation. Twelve persons testified on Defendant’s behalf and said he was a good man and asked that the court be |4lIenient in sentencing. Forty-one letters were submitted on Defendant’s behalf, asking the trial court to consider a suspended sentence or probation.
The trial court discussed the PSI report and noted that Defendant had no prior felony convictions and that he had at least one misdemeanor conviction for simple battery of a Town alderman. It stated that Defendant’s conduct in office resulted in significant economic losses to the Town and opined that Defendant is without remorse and appears to deny any culpability.
The trial court further stated that Defendant’s sentences should be served consecutively because the bill of information does not indicate that the counts were all part of the same act or transaction or part of a common plan.
The trial court noted that, pursuant to La. C. Cr. P. art. 894.1(A)(1), a sentence of incarceration should be imposed because, as demonstrated by Defendant’s behavior as reported in the PSI report, there is an undue risk that he will commit another crime. It further noted that Defendant’s constituents put their trust in him as an elected public official to perform his job according to the law; and, therefore, a lesser sentence than one that requires incarceration would deprecate the seriousness of the crime.
The trial court also addressed the La. C. Cr. P. art. 894.1 factors and noted the following aggravating factors: Defendant’s crimes and conduct while on bail; his personal use of a Town vehicle; his use of public funds for the inauguration party; the land transaction; his use of his position as mayor to commit the crimes; Defendant acted or caused others to act in a |42way to influence the outcome of the criminal proceedings; and the Town suffered significant economic loss, which far exceeded the amount stated in the bill of information. The trial court noted that two mitigating factors apply, i.e., that Defendant has no history of any prior felony conviction and that a sentence of incarceration would entail hardship to him and his family. It further noted that Defendant would not be a threat to citizens of the Town as far as any violent criminal behavior and would not be a flight risk. Noting Defendant’s actions in attempting to have his wife appointed as interim mayor, the trial court stated that, if given just a sus *168 pended sentence, Defendant would continue enmeshing himself in the operation of the Town to its extreme detriment. It found that Defendant is not likely to respond affirmatively to probationary treatment and that his behavior is likely to recur while on probation unless he is first subjected to a period of incarceration.
As to Count I, the trial court sentenced Defendant to three years to the Louisiana Department of Corrections (“LDOC”) with a $1,000 fíne. As to Count II, the trial court sentenced Defendant to three years to the LDOC with a $1,000 fine. As to Count III, the trial court sentenced Defendant to five years to the LDOC, with all five years suspended and Defendant placed on supervised probation upon his release from incarceration, with a $1,000 fine and order to pay court costs. The trial court ordered Counts I and II to run consecutively with each other, but concurrently with Count III, with credit for time served. It also ordered that, during the course of the five-year supervised probation, Defendant make restitution to the Town in the |4Samount of $51,792.81, which is a result of the $13,720.75 of Count II and the $38,072.06 of Count III, in equal monthly installments over the first 60 months of his probated sentence, as well as paying $3,000 in fines and all court costs. The trial court further ordered multiple conditions of probation, including that Defendant have no contact whatsoever, directly or indirectly, or acting by himself or through others, with the Town and any of its elected officials and employees unless specifically authorized by written permission from his probation officer or with written court authority.
On October 17, 2013, the trial court filed a judgment of conviction and felony sentence. It also denied Defendant’s motion for release from custody pending appeal, filed October 17, 2013, because of the reasons for judgment regarding sentencing.
On October 30, 2013, Defendant filed a notice of intent to apply for expedited writs regarding the denial of his motion for release from custody and bail pending appeal. On December 13, 2013, the trial court denied the stay. On December 20, 2013, this court denied the writ. State of Louisiana v. Leslie C. Thompson, 49,086-KW (La.App.2d Cir.12/13/13).

Motion to Reconsider Sentence

On October 30, 2013, Defendant filed a motion to reconsider the sentence. Defendant argued that the sentence imposed violates the right of due process, the right to equal protection of the law, the state constitutional right against excessive punishment and the federal right against cruel and unusual punishment. He contended that the trial court did not follow, apply or consider the guidelines set forth in La. C. Cr. P. art. 894.1 and that the |44penalty imposed is cruel, unusual and excessive. On October 30, 2013, the trial court denied this motion.
Defendant now appeals his convictions and sentences.
DISCUSSION[12]

Insufficiency of the Evidence

In the first three assignments of error in his counseled brief, Defendant argues that *169 the evidence presented at trial was insufficient to convict him of Counts I, II and III, respectively. In his first two pro se assignments of error, Defendant argues that the evidence was insufficient to convict him as to Counts II and III, respectively.
The standard of appellate review for a sufficiency of the evidence claim is “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Hearold, 603 So.2d 731 (La.1992). See also La. C. Cr. P. art. 821. This standard does not provide an appellate court with a vehicle for substituting, its appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165.
The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). A reviewing court may not impinge on the fact finder’s discretion unless it is necessary to guarantee the fundamental due process of law. Id. The appellate court does not assess credibility or reweigh the evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of a witness, the matter is one of the weight of the' evidence, not its sufficiency. State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, unit denied, 02-2595 (La.3/28/03), 840 So.2d 566; and writ denied, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
Direct evidence provides proof of the existence of a fact, e.g., a witness’s testimony that he saw or heard something. State v. Lilly, 468 So.2d 1154 (La.1985), citing State v. Austin, 399 So.2d 158 (La.1981). Circumstantial evidence provides proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. Id. When there is direct | ^evidence, the trier of fact weighs the credibility of evidence, and the reviewing court applies the Jackson standard and gives great deference to the fact finder’s conclusions, assuming the proven facts most favorable to the state. Id. When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the reviewing court must assume every fact that the evidence tends to prove, and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; State v. Lilly, supra.
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24.
Thus, in order for Defendant’s convictions to be upheld, the record must establish that the state proved beyond a reasonable doubt all of the essential elements of malfeasance in office. La. R.S. 14:134 states, in pertinent part:
*170 A. Malfeasance in office is committed when any public officer or public employee shall:
(1) Intentionally refuse or fail to perform any duty lawfully required of him, as such officer or employee; or
(2) Intentionally perform any such duty in an unlawful manner; or
(3) Knowingly permit any other public officer or public employee, under his authority, to intentionally refuse or fail to perform any duty lawfully required of him, or to perform any such duty in an unlawful manner.
B. Any duty lawfully required of a public officer or public employee when delegated by him to a public officer or public |^employee shall be deemed to be' a lawful duty of such public officer or employee. The delegation of such lawful duty shall not relieve the public officer or employee of his lawful duty.
Intent is an important element in the offense of malfeasance. As noted by the Louisiana Supreme Court in State v. Petitto, 10-0581 (La.3/15/11), 59 So.3d 1245 (emphasis in original):
The object of the malfeasance statute is to punish a breach of duty committed with the required culpable state of mind. To this end, the statute expressly limits its application to instances in which a public officer or employee intentionally refuses or fails to perform or intentionally performs in an unlawful manner, any affirmative duty imposed by law upon him in his role as a public servant. The inclusion in the statute of a criminally culpable state of mind makes it clear that it applies only where the statutorily required mens rea is proven beyond a reasonable doubt. Thus, mere inadvertence or negligence, or even criminal negligence, will not support a violation of the malfeasance statute because the statute specifies the act or failure to act must be intentional.
Before a public official can be charged with malfeasance in office, there must be a statute or provision of the law which delineates an affirmative duty upon the official. State v. Perez, 464 So.2d 737 (La.1985), citing State v. Passman, 391 So.2d 1140 (La.1980). The duty must be expressly imposed by law upon the official because the official is entitled to know exactly what conduct is expected of him in his official capacity and what conduct will subject him to criminal charges. Id.
The mayor is the chief executive officer of a municipality. La. R.S. 33:362(B). Relevant to this matter, La. R.S. 33:404 imposes the following powers, duties and responsibilities on the mayor:
(1) To supervise and direct the administration and operation of all municipal departments, offices, and agencies, other than a police department with an elected chief of police, in conformity with ordinances adopted by the board of aider-men and with Inapplicable provisions of state law; however, no such ordinance may limit the authority granted to the mayor by this Paragraph. All administrative staff shall be subordinate to the mayor.
(2) To delegate the performance of administrative duties to such municipal officers or employees as he deems necessary and advisable.
(3) Subject to applicable state law, ordinances, and civil service rules and regulations, to appoint and remove municipal employees, other than the employees of a police department with an elected chief of police. However, appointment or removal of a noneleeted chief of police, the municipal clerk, the municipal attorney, or any department head shall be subject to approval by the board of aldermen, except that in the case of a tie *171 vote, the recommendation of the mayor shall prevail. Furthermore, selection or removal of any person engaged by a municipality to conduct an examination, review, compilation, or audit of its books and accounts pursuant to R.S. 24:513 shall be subject to approval by the board of aldermen of that municipality.
[[Image here]]
(5) To prepare and submit an annual operations budget and a capital improvements budget for the municipality to the board of aldermen in accordance with the provisions of R.S. 39:1301 et seq. and any other supplementary laws or ordinances.
[[Image here]]
(9) To have any other power or perform any other duty as may be necessary or proper for the administration of municipal affairs not denied by law.
Count I
In Count I, Defendant was charged with malfeasance in office for neglecting, failing or refusing to provide the legislative auditor with records; for denying the legislative auditor access to records; for refusing, failing or neglecting to transmit reports, statements of accounts and other documents to the legislative auditor; for obstructing or impeding the legislative auditor’s examination; for failing to exercise diligence and care in preserving the Town’s public records for the requisite period of time; and |4afor failing to establish and maintain an active continuing program for the economical and efficient management of the records of the Town.
Regarding Count 1(1) to (4), Defendant argues that the disclaimers by the independent auditors resulted from failed duties of the Town clerk and not of Defendant. With regard to Count 1(5) and (6), Defendant notes that it is the duty of the Town clerk, as custodian of the public records, to preserve and manage the records, not the mayor. Defendant also argues that the mayor is not a principal to the Town clerk who failed to perform her duties. He contends that the evidence shows he cooperated with independent and legislative auditors and accepted and implemented their recommendations. Defendant further states that he did not obstruct or impede the legislative auditors in making their examinations and, to- the contrary, he and his staff cooperated with the examinations. Defendant also argues that he did not intend for the accounting problems that befell the Town clerk’s office to occur.
The state argues that it established the essential elements of Count I beyond a reasonable doubt. It notes that testimony established the Town’s lack of financial records, lack of recordkeeping, lack of accounting and mishandling of public funds. It explains that the law imposed a duty on Defendant as mayor to maintain proper records and to supply them to the LLA and that he failed in those duties. The state also notes that the mayor has the duty and responsibility to supervise and direct the administration and operation of all municipal departments, offices and agencies.
Article VI, § 44, of the Louisiana Constitution provides the following definitions pertinent to this matter:
(1) “Local governmental subdivision” means any parish or municipality.
(2) “Political subdivision” means a parish, municipality, and any other unit of local government, including a school board and a special district, authorized by law to perform governmental functions.
(3) “Municipality” means an incorporated city, town, or village.
[[Image here]]
*172 (5) “General law” means a law of statewide concern enacted by the legislature which is uniformly applicable to all persons or to all political subdivisions in the state or which is uniformly applicable to all persons or to all political subdivisions within the same class.
The Public Records Law states that the heads of each.state agency and its subdivisions must establish and maintain an active records management system for use in conducting business and in compliance with the division regulations and provisions. La. R.S. 44:412. Specifically, La. R.S. 44:412(A) requires:
The head of each agency of the state and its subdivisions shall establish and maintain an active, continuing program for the economical and efficient management of the records of the agency. Such program shall provide for: effective controls over the creation, maintenance, and use of records in the conduct of current business; cooperation with the division in applying standards, procedures, and techniques designed to improve the management of records, promote the maintenance and security of records deemed appropriate for preservation, and facilitate the segregation and disposal of records of temporary value; and compliance with the provisions of this Chapter and the rules, and regulations of the division.
La. R.S. 44:402(5) defines “agency” as: any state, parish and municipal office, department, division, board, bureau, commission, authority, or other separate unit of Instate, parish, or municipal government created or established by the constitution, law, resolution, proclamation, or ordinance.
La. R.S. 44:1(A)(1) defines “public body” as:
any branch, department, office, agency, board, commission, district, governing authority, political subdivision, or any committee, subcommittee, advisory board, or task force thereof, any other instrumentality of state, parish, or municipal government, including a public or quasi-public nonprofit corporation designated as an entity to perform a governmental or proprietary function, or an affiliate of a housing authority.”
La. R.S. 44:1(A)(3) defines “custodian” as:
the public official or head of any public body having custody or control of a public record, or a representative specifically authorized by him to respond to requests to inspect any such public records.
La. R.S. 44:36 stipulates how such records must be preserved and states, in part, that:
A. All persons and public bodies having custody or control of any public record, other than conveyance, probate, mortgage, or other permanent records required by existing law to be kept for all time, shall exercise diligence and care in preserving the public record for the period or periods of time specified for such public records in formal records retention schedules developed and approved by the state archivist and director of the division of archives, records management, and history of the Department of State. However, in all instances in which a formal retention schedule has not been executed, such public records shall be preserved and maintained for a period of at least three years from the date on which the public record was made....
[[Image here]]
C. All existing records or records hereafter accumulated by the various services of the state or its subdivisions which participate in federal programs or *173 receive federal grants may be destroyed after three years from the date on which the records were made in those cases where this provision is not superseded by guidelines for the operative federal program or grant requiring longer retention periods for the records in question; provided that these records shall not be destroyed in any case where litigation with reference thereto is pending, or [sp.until the appropriate state or federal audits have been conducted.
Municipalities must be annually audited by a licensed certified public accountant, and its officials must furnish whatever papers, books, accounts, records, files, instruments, documents, films, tapes and any other forms of recordation that are necessary for review. La. R.S. 24:513(A).
An officer of the auditee, or municipality, who violates the requirements for providing the records necessary for audit shall be subject to fines and penalties, shall be deemed guilty of malfeasance and gross misconduct in office and shall be subject to removal. La. R.S. 24:518(A)(2).[13]
As evident from the trial testimony, the state provided sufficient evidence to prove malfeasance in office beyond a reasonable doubt. Because of the incomplete and unorganized state of the Town’s financial records, independent auditors were unable to form opinions on the Town’s financial situation and issued disclaimers for five consecutive fiscal years. In response to the disclaimers and other allegations of mismanagement of Town funds, the LLA’s office conducted a compliance audit and an investigative audit. The legislative auditors noted the same problems as the independent auditors as to the state of the Town’s financial records. Mr. Kelley testified that, of $1,100,000 in expenditures, only $385,000 was documented, and the Town was unable to provide documentation for 172 expenditures. He noted that the records were generally disorganized l^and that there were stacks of documents in Town Hall. Ms. Whitehead stated that she had to make an adjustment of $3.6 million for a bank account that had not been reconciled for four years. She testified that the root of the problems in the Town were the accounting records, which were missing, incomplete, in disarray, disorganized and “a train wreck.” Although Defendant submitted a response to the compliance audit and set forth actions that would be taken, the problems persisted. The legislative auditors who conducted the 2013 investigative audit stated that the investigation was difficult because of the state of the Town’s records.
As stated in R.S. 44:412 and the definitional statutes, Defendant was responsible for ensuring that the Town’s public records were properly managed, maintained and preserved and for providing sufficient records so that the annual audit could be timely completed. The evidence presented at trial demonstrates that the independent and legislative auditors were unable to complete the audits because of the disorganized and incomplete state of the Town’s financial records. The evidence further shows that, through the reports submitted by, and conversations with, the auditors, the fiscal administrator and the Town staff, Defendant was aware that the Town was not in compliance with state laws, but he did not take sufficient action to remedy those continuing problems.
When the Town received the first disclaimer, Defendant had notice of the dire *174 state of the Town’s financial records and practices. As mayor, he knew it was his duty to resolve these problems so that the Town could become and remain compliant with state laws regarding audits and I,^preservation of public records. However, the same problems plagued the Town for the following four years; and, as new disclaimers were reported, Defendant received additional notice that the Town’s records were still not properly maintained.
Although Defendant hired new staff to assist with accounting and purchased a new accounting computer program, these actions did not remedy the enormous problems faced by the Town. These remedial steps were not sufficient to meet his statutorily imposed duties to ensure that departments and employees under his supervision were properly performing their jobs such that the Town was in compliance with state laws.
.The failure to maintain the public records was illustrated by the Town’s inability to reconcile bank accounts; delinquent payment of bills; informal payroll records; and improper recordation of payments for property taxes, utility accounts and traffic fines. Further, the Town was denied funding because it was noncompliant with the state audit law and had expenditures cut because it did not pass a budget.
The fact that the same problems with financial recordation' and management persisted for five consecutive years without remedy demonstrates Defendant’s intentional refusal and failure to perform his statutory duties as' mayor. Defendant’s penchant to refuse to follow the law is further illustrated by his failure to provide proper documentation for his use of the Town vehicle, for sponsoring Town events, for personally accepting payment for tickets to the event and for untimely reimbursing the Town for travel advances.
IssAlthough Defendant contends that the Town clerk’s failure led to the Town’s financial recordation problems, as chief executive officer, Defendant was charged with supervising the operations of all the Town’s departments and employees to ensure compliance with state law. The evidence presented shows that Defendant as mayor violated La¡ R.S. 44:412 by failing to maintain an active records management system for use in conducting business and in compliance with regulations. Multiple auditors found that transactions were not recorded and records were missing. Defendant failed to preserve records, as required under La. R.S. 44:36, in that public records were not maintained for three years. Defendant’s violations of the annual audit requirements in La. R.S. 24:513 and La. R.S. 24:518 were shown by his failure to present sufficient records for auditors to successfully complete an audit for the fiscal years ending on June 30 of 2008, 2009, 2010, 2011 and 2012.
Considering the evidence in a light most favorable to the prosecution, the evidence presented at trial was sufficient to prove beyond a reasonable doubt that Defendant was guilty of malfeasance in office as to Count I. Accordingly, this assignment of error is without merit.
Count II[14]
In Count II, Defendant was charged with malfeasance in office by the taking of public funds belonging to the Town to pay for MERS benefits for ineligible employees in the amount of $13,720.75. In his counseled brief, Defendant explains that the fiscal administrator demoted six employees to | sr,part-time status based *175 upon his interpretation of the word “consistently” in the Town’s policies. Defendant contends that he presented evidence that these six employees were, in fact, full-time, regularly scheduled employees. In his pro se brief, Defendant argues that an invalid statute was used to support the charge of Count II and that the state failed to prove intent, which is an essential element of the crime.
The state argues that it established the essential elements of Count II beyond a reasonable doubt when it demonstrated that Defendant unlawfully paid retirement benefits into MERS for individuals who were not full-time employees, as the term is defined in the law, because they did not work 35 hours per week. It explains that Defendant knowingly signed checks and paid benefits out of Town funds for individuals who did not qualify to receive the benefits.
La. R.S. 14:67(A) defines theft as:
the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
La. R.S. 11:1751 sets forth the requirements for membership in MERS and states that “[a]ny person who qualifies as an employee pursuant to R.S. ll:1732(13)(b) shall participate in and contribute to the system on all earnings from all participating employers.” La. R.S. ll:1732(13)(a) defines “employee” as “a person including an elected official, actively employed by a participating employer on a permanent, regularly scheduled basis of at least an average of thirty-five hours per week.”
|S7The Town’s policy defines a full-time employee as one who “consistently work[s] more than 35 hours per week” and defines a part-time employee as one who “consistently workfs] fewer. than, 35 hours per week.” The policy adds that “[ujnless specifically stated, part-time employees are not afforded any benefits other than wages; for example, they do not accrue benefits such as sick days, vacation days, holidays, and health-insurance.”
The evidence presented at trial demonstrates that six employees were not consistently working 35 hours per week, but were included in the MERS system. Mr. Ryder and Mr. Clapinski both testified about the methods they employed to determine whether employees were consistently working 35 hours per week and noted that paid days off were taken into consideration. Although several witnesses testified that Defendant pronounced it was his decision who was a full-time or part-time employee, the Town policy and the state law, not Defendant, determine retirement program eligibility. Because six employees were not eligible under the Town policy or statute, the retirement contribution payments made by the Town for these employees were improper.
Several witnesses testified that they notified Defendant of the improper payment of retirement contributions for ineligible employees. Defendant’s decision to continue using the Town’s public funds to pay retirement contributions for ineligible employees, even after being notified of their ineligibility, indicates his intent to permanently deprive the Town of these public funds.
| .^Considering the evidence in a light most favorable to the prosecution, the evidence presented at trial was sufficient to prove beyond a reasonable doubt that Defendant was guilty of malfeasance in office *176 as to Count II. Accordingly, this assignment of error is without merit.
Count III[15]
In Count III, Defendant was charged with malfeasance in office by the taking of the Town’s public funds to pay for BCBS insurance premiums for non-employees of the Town'in the amount of $38,072.06.
In his counseled brief, Defendant contends that there was no intentional refusal or failure to perform or an intentional performance of a duty in an unlawful manner by him because the Town diligently tried to cancel the policies or deduct the former employees’ parts/premiums from the invoice so that the Town would not pay the BCBS premiums. In his pro se brief, Defendant argues that an invalid statute was used to support the charge of Count III and that the state failed to prove intent, which is an essential element of the crime.
The state argues that it established the essential elements of Count III beyond a reasonable doubt by demonstrating that Defendant paid insurance benefits with Town funds on behalf of individuals who were not employed by the Town. The state contends that Defendant’s claim that an attempt to cancel the coverage alleviates any claim of malfeasance should be rejected.
La. R.S. 14:68 defines unauthorized use of a movable as “the intentional taking or use of a movable which belongs to another, either | B9without the other’s consent, or by means of fraudulent conduct, practices, or representations, but without any intention to deprive the other of the movable permanently.”
The evidence presented at trial suggests that little effort was made by Town employees to resolve the improper payments of public funds for the insurance premiums. Significantly, the evidence demonstrates that Defendant took no action to assist the employees in ending these payments. Defendant continued to sign the checks for the premium payments after he was notified that persons not employed by the Town were receiving insurance benefits. Although he contends that it was the employees’ job to ensure the cancellation of the policies, he fails to admit that it is his responsibility to manage and oversee the Town’s employees. As the employees’ supervisor and head of the municipality, it was his statutory duty to properly manage the employees’ and the Town’s resources.
Considering the evidence in a light most favorable to the prosecution, the evidence presented at trial was sufficient to prove beyond a reasonable doubt that Defendant was guilty of malfeasance in office as to Count III. Accordingly, this assignment of error is without merit.

Jury Instructions

In his fourth counseled assignment of error, Defendant argues that the trial court erred in refusing to give the jury instructions he requested. Defendant explains that an instruction listing the duties of the municipal clerk should have been included to show that Defendant was justified in his belief that the Town clerk would perform her duties. Defendant further |finContends that the jury should have been instructed that it could find Defendant not guilty if it found justification pursuant to La. R.S. 14:18. Defendant requested the following instructions:
1.
*177 Justification; general provisions.
The fact that an offender’s conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct. This defense of justification can be claimed under the following circumstances:
(1) When the offender’s conduct is an apparently authorized and reasonable fulfillment of any duties of public office; or
(2) When for any reason the offender’s conduct is authorized by law; or
(3) When the crime consists of a failure to perform an affirmative duty and the failure to perform is caused by physical impossibility.
2.
Therefore if you find that Leslie Thompson committed the acts alleged in the Bill of Information but that the acts were apparently authorized and reasonable fulfillment of his duties of public office you are to find him not guilty.
If you find that Leslie Thompson committed the acts alleged in the Bill of Information but that his conduct was for any reason authorized by law you are to find him not guilty.
Also, if you find that Leslie Thompson committed acts in the Bill of Information which consists of a failure to perform an affirmative duty but the failure was caused by physical impossibility then you are to find Leslie Thompson not guilty of that charge or those charges.
The state argues that the jury instructions were properly refused. It explains that Defendant, as the mayor, was charged with administering, supervising and directing the activities of the clerk; and, therefore, his contention that the jury should have been instructed on the duties of the municipal clerk is without merit. The state also explains that instructions concerning the justification defense were properly denied because |fi1 Defendant never claimed he was physically incapable of performing his duties and because he cannot be guilty of not fulfilling his public duty and at the same time be justified in his actions because he was fulfilling his public duty.»
The trial court shall charge the jury as to the law applicable to the case. La. C. Cr. P. art. 802. A requested special charge shall be given by the court if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. La. C. Cr. P. art. 807.
Regarding the instruction of the clerk’s duties, Defendant does not sufficiently demonstrate how the statute imposing duties on the municipal clerk is applicable to this case, which is based on the duties imposed on the mayor as the executive of the Town and supervisor and manager of the various departments and employees. An inclusion of the clerk’s imposed duties would have necessitated an explanation that the imposition of duties on the clerk does not negate the duty imposed on the mayor to supervise the clerk and properly manage the Town’s departments to ensure the Town’s compliance with state laws.
Regarding the justification instruction, a review of the written charge to the jury and of the trial transcript demonstrates that the trial court did instruct the jury as to justification. Although the trial court did not include Section 2 of the requested instructions, it did include Section 1, which quotes the law set forth in La. R.S. 14:18. Further, Defendant may not claim that his actions were justified because he was performing his public duty when he is charged with failing to perform his public duty. Also, no |fí2evidence was presented at trial that supports the notion that Defendant’s failure to properly per *178 form his duties was due to a physical impossibility.
Accordingly, this assignment of error is without merit.

Sentencing

In his fifth counseled assignment of error, Defendant argues that the trial court erred in his sentencing. Defendant notes that, despite testimony of his good character at the sentencing hearing and the trial court’s finding that incarceration would entail hardship on Defendant and his family, the trial court rendered a sentence of imprisonment. Defendant contends that the trial court incorrectly determined that there was an undue risk that he would commit another crime. He further argues that the sentence imposed is an illegal sentence because their consecutive nature could cause him to serve more time than the maximum sentence. In his third pro se assignment of error, Defendant argues that the trial court erred when it declared that the charges were not of the same conduct, when it gave little to no weight to mitigating factors and when it ordered the penalty beyond the statutory maximum.
The state contends that Defendant’s sentences are within the statutory guidelines and are proper. It notes that Defendant’s sentences for Counts I and II are midrange sentences and that his sentence for Count III was completely suspended.
When reviewing an excessive sentence claim, the appellate court uses a two-prong test. First, the trial record must demonstrate that the trial court complied with La. C. Cr. P. art. 894.1. The trial court is not required to list every aggravating and mitigating circumstance, but the record must reflect that the trial court adequately considered the guidelines of La. C. Cr. P. art. 894.1. State v. Smith, 433 So.2d 688 (La.1983). The trial court should consider the defendant’s personal history and prior criminal record, the seriousness of the offense, the likelihood that the defendant will commit another crime and the defendant’s potential for rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981). The trial court is not required to assign any particular weight to any specific matters at sentencing. State v. Quiambao, 36,587 (La.App.2d Cir.12/11/02), 833 So.2d 1103, writ denied, 03-0477 (La.5/16/03), 843 So.2d 1130. When the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary, even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982).
As to the first prong of the excessive-sentence test, the trial court adequately complied with La. C. Cr. P. art 894.1. During the sentencing hearing, the trial court stated that it had reviewed the PSI report and discussed Defendant’s criminal history. It noted in detail the aggravating and mitigating circumstances it considered when deciding Defendant’s sentence.
 Second, the appellate court must determine if the sentence is constitutionally excessive. A sentence is excessive and violates La. Const. Art. 1, § 20, if it is grossly out of proportion to the severity of the crime or is nothing more than the purposeless and needless imposition of pain and suffering. State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Id. A trial court has wide discretion in imposing a sentence within the statutory limits, and a sentence should not be set aside absent a showing of abuse of discretion. State v. Square, 433 So.2d 104 (La.1983); State v. Black, 28,100 (La.App.2d Cir.2/28/96), 669 So.2d 667, *179 writ denied, 96-0836 (La.9/20/96), 679 So.2d 430.
La. R.S. 14:134(C) sets forth the sentence for malfeasance in office and states:
(1) Whoever commits the crime of malfeasance in office shall be imprisoned for not more than five years with or-without hard labor .or shall be fined not more than five thousand dollars, or both.
(2) In addition to the'penalty provided for in Paragraph (1) of this Subsection, a person convicted of the provisions of this Section may be ordered to pay restitution to the state if the state suffered a loss as a result of the offense. Restitution shall include the payment of legal interest at the rate provided in R.S. 13:4202.
As to Count I, the trial court sentenced Defendant to three years at hard labor with a $1,000 fine. As to Count II, the trial court sentenced Defendant to three years at hard labor with a $1,000 fine. As to Count III, the trial court sentenced Defendant to five years at hard labor, with all five years suspended and five years’ supervised probation upon his release from incarceration, with a $1,000 fine and court costs. It ordered Counts I and II to run consecutively with each other, but concurrently with Count III, with credit for time served. It also ordered that, during the course of the supervised probation, Defendant make restitution to the Town in the amount | Rfiof $51,792.81, which is a result of the $13,720.75 of Count II and the $38,072.06 of Count III, in equal monthly installments over the first 60 months of probation as well as paying the $3,000 in fines and all court costs. The trial court further ordered multiple conditions of probation, including that Defendant have no contact whatsoever with the Town and any of its elected officials and employees unless specifically authorized by written permission from his probation officer or with written court authority.
Although all of the sentences imposed are within statutory bounds and individually are not excessive, the six-year imprisonment resulting from consecutive Counts I and II, the five-year post-incarceration probationary period for Count III and the restitution of $51,792.81 together create an excessive sentence.
When a defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La. C. Cr. P. art. 883. This court, in State v. Boudreaux, 41,660 (La.App.2d Cir.12/13/06), 945 So.2d 898, writ denied, 07-0058 (La.11/2/07), 966 So.2d 591, set forth the law as to consecutive and concurrent sentences, stating:
Concurrent sentences arising out of a single cause of conduct are not mandatory, and it -is within a trial court’s discretion to order sentences to run consecutively rather than concurrently.
A judgment directing that sentences arising from a single' course of conduct be served consecutively requires particular justification from the evidence or record. When consecutive [^sentences are imposed, the court shall state the factors considered and its reasons for the consecutive terms.
Among the factors to be considered are the defendant’s criminal history, the gravity or dangerousness of the offense, the viciousness of the crimes, the harm done to the victims, whether the defendant constitutes an unusual risk of danger to the public, the potential for defendant’s rehabilitation, and whether defendant has received a benefit from a plea bargain.
*180 ... [T]he failure to articulate specific reasons for consecutive sentences does not require remand if the record provides an adequate factual basis to support consecutive sentences.
(Internal citations omitted.)
Citing La. C. Cr. P. art. 883, the trial court determined that Defendant’s sentences should be served consecutively, unless otherwise noted by the court. It explained that the counts were not all part of the same act or transaction or all part of a common plan, as evidenced in the allegations contained in the bill of information.
We find that the trial court failed to articulate sufficient reasons to order that the sentences for Counts I and II run consecutively. The charges in this case stem from Defendant’s failures as mayor as set forth in the LLA’s compliance and investigative audit reports and are, therefore, part of the same acts and transactions. This record does not provide an adequate factual basis and the trial court failed to articulate such factors as Defendant’s criminal history, the dangerousness of the offense, the risk to the public and the potential for rehabilitation to support consecutive sentences. Accordingly, concurrent sentences of no more than three years’ imprisonment for each count are more appropriate under the circumstances of this case, and it is within the trial court’s discretion to determine what portions, if any, of these concurrent sentences should be probated.
|CTWe further find that restitution was not sufficiently proven in this case as to Count II. La. R.S. 14:134(C)(2) states that a person convicted of malfeasance in office “may be ordered to pay restitution to the state if the state suffered a loss as a result of the offense.” The state did not prove that it suffered a loss regarding the Town’s contributions to MERS. Although Ms. Suire, án administrative assistant for MERS, testified that, when a person seeks a refund, the refund is for the employee’s contributions to MERS, not the employer’s contributions, her testimony did not demonstrate that the employer’s contribution could not be recovered. Further, Mr. Cla-pinski testified that the $13,721 amount in Count II was determined by matching employee earnings and contributions reports with checks that the Town issued to MERS. Therefore, the funds improperly contributed to the part-time employees’ MERS accounts are traceable and should be recoverable from those persons who improperly received the employer contributions. We distinguish the employer contributions to MERS in Count II from the funds paid to BCBS in Count III. The Town funds paid to BCBS cannot be recovered from an account — these funds have been used to pay for insurance coverage.
Accordingly, this assignment of error has merit. We vacate Defendant’s sentences and remand this matter to the trial court for resentencing in conformity with the findings of this opinion.

Other Crimes Evidence

In his sixth counseled assignment of error, Defendant argues that the trial court erred in allowing the state to present other crimes, wrongs or acts | ^evidence against him. Defendant contends that the acts listed in the 404(B) notice are ambiguous and repetitive and are not crimes, wrongs or acts contemplated by La. C.E. art. 404(B). Defendant suggests that the jury was confused by these allegations and may have thought he was on trial for the 404(B) acts rather than the acts listed in the bill of information. He further alleges that the state has not shown by clear and convincing evidence that .he committed the acts alleged in the 404(B) motion.
The state'argues that it did not improperly introduce 404(B) evidence. It ex *181 plains that notice was given and that the acts described in the notice relate directly to the conduct of Defendant as mayor.
La. C.E. art. 404(B)(1) states:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
In this case, Defendant was charged with three counts of malfeasance in office, which required the state to prove that he intentionally refused or failed to perform a duty lawfully required of him or that he intentionally performed such duty in an unlawful manner. La. R.S. 14:134. Where the element of intent is regarded as an essential ingredient of the crime charged, it is proper to admit proof of similar but disconnected crimes, wrongs or acts to show the intent with which the act charged was committed. State v. Bruce, 47,055 (La.App.2d Cir.5/25/12), 93 So.3d 717, citing State v. Jackson, 625 So.2d 146 (La.1993). The state is required to prove that the defendant committed these other crimes, wrongs or acts by clear and convincing evidence. State v. Jackson, supra, citing State v. Davis, 449 So.2d 466 (La.1984). The probative value of the other crimes evidence must outweigh its prejudicial effect. La. C.E. art. 403.
-A trial court’s ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. State v. Bruce, supra, citing State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996). The erroneous introduction of other crimes evidence is subject to harmless-error review. Id., citing State v. Roberson, 40,809 (La.App.2d Cir.4/19/06), 929 So.2d 789.
The Louisiana Supreme Court in State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94, discussed the Louisiana harmless-error standard and stated that “appellate courts should not reverse convictions for errors unless the accused’s substantial rights have been violated.” The Johnson court noted that Louisiana has adopted harmless-error tests set forth by the United States Supreme Court in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The inquiry in Chapman is whether it appears “beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.” Chapman v. California, supra. The .inquiry in Sullivan “is not whether, in a trial that occurred without the |7nerror, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.” Sullivan v. Louisiana, supra. The court must consider “not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand.” Id.
The Johnson Court also discussed the difference:
between “trial errors,” which may be reviewed for harmless error, and “struc *182 tural errors,” which defy analysis by harmless error standards.
Trial error occurs during the presentation of the case to the trier of fact and may be quantitatively assessed in the context of the other evidence to determine whether its admission at trial is harmless beyond a reasonable doubt. A structural error is one which affects the framework within which the trial proceeds.
State v. Johnson, supra, citing Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
In this case, the state filed a 404(B) notice seeking to introduce at trial evidence related to various findings from the 2011 compliance audit, the appointment of the fiscal administrator and the 2013 investigative audit. The state explained that its purpose in using these acts was to show Defendant’s pattern of operation, motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident and noted that all of the acts related to conduct that constituted an integral part of the acts and transactions at issue in the case. We .note that the compliance arid investigative audits also served as the basis for the charges in the bill of information. Unlike the acts included in the bill of information that had to |71be proven beyond a reasonable doubt by the state at trial, one can assume that the acts included in the 404(B) notice were not charged as crimes in the bill of information because the state had insufficient evidence to meet this burden of proof, but could allegedly meet the burden of clear and Convincing evidence.
As detailed in the Facts section of this opinion, a hearing was held on the 11 acts alleged in the 404(B) notice. After the testimony of Mr. Kelley, Mr. Ryder and Mr. Clapinski, the trial court determined that the probative value of the 11 acts “would certainly” outweigh any prejudice and, therefore, allowed the 404(B) evidence to be introduced and made part of the record. The trial court failed to address each item individually and made one collective ruling as to all 11 alleged acts. We note that each item should have been examined individually as to whether it met the requirements of La. C.E. arts. 403 and 404 and was proven by clear and convincing evidence. This analysis is necessary to ascertain whether the trial court erred in allowing each of the 11 alleged acts to be introduced into evidence.
1. Defendant made no collection efforts on delinquent utility accounts.
Mr. Kelley’s testimony that there were uncollected utility accounts with substantial balances demonstrates by clear and convincing evidence that Defendant, whose responsibility it was to direct the operation of municipal departments, willfully did not fulfill his duty of ensuring the collection of delinquent accounts. This alleged act relates to the charges of 172Count I, and the probative value of including this act as an illustration of Defendant’s intent to commit malfeasance outweighs its prejudicial effect.
2. Defendant made no effort to hold a tax sale for unpaid 2008 property taxes.
This, too, is a failure by Defendant to act and perform his statutory duties as mayor. Although it is questionable whether the mere fact that this alleged act was cited as a deficiency in an audit report constitutes clear and convincing evidence, this failure to act illustrates the consequences of incomplete recordkeeping by the administration of the Town, which relates to Count I. The probative value of including this act as an illustration of De *183 fendant’s intent to commit malfeasance outweighs its prejudicial effect.
3. Defendant authorized extended payment terms for unpaid utility balances.
Mr. Kelley testified that Defendant’s authorization to extend payment terms could be considered an improper loan or donation of public funds in violation of state law or of the Town’s ordinance for pursuing unpaid accounts. This meets the clear and convincing evidence standard, relates to the charges by demonstrating intent and the probative value outweighs thé prejudicial effect.
4. Defendant participated in the sale and swapping of land without proper appraisal or board approval.
At the 404(B) hearing, Mr. Kelley testified that Defendant referred questions about this land sale to Mr. Stokes. At trial, Mr. Stokes testified that the board of aldermen accepted an offer, but that a different parcel of | ^property was sold. The sale of this property does not seem similar to the charged offenses and could be seen as resulting from some confusion and miscommunication between Mr.Stokes and the board of aldermen rather than an intentional bad act by Defendant. Accordingly, this alleged act should not have been introduced into evidence.
5. Defendant hosted an inauguration ceremony and paid for it with public funds.
Mr. Kelley’s testimony that a review of bank statements and cancelled checks demonstrated thát Town funds were used to pay for this celebration meets the clear and convincing standard. However, this alleged act does not appear similar to the charged offenses and, therefore, should not have been introduced into evidence.
6.Defendant conducted the Town’s business and financial operations with significant deficiencies as noted in the compliance audit.
Mr. Kelley testified that these deficiencies resulted from the incomplete state of'the Town’s financial records, which is similar to the conduct charged in Count I. The testimony presented demonstrates by clear and convincing evidence Defendant’s failures in conducting business and financial operations, and the probative value of this evidence outweighs its prejudicial effect.
|747. Defendant mismanaged the operations of the Town such that the appointment of a fiscal administrator was necessary.
Mr. Ryder’s testimony about his appointment as fiscal administrator is not an other crime, wrong or act by Defendant as mayor. Although his appointment may have resulted from alleged acts of mismanagement detailed in the other 404(B) acts, the appointment itself is not an other crime, wrong or act as contemplated by La. C.E. art. 404(B).
8. Defendant paid full-time benefits to non-full-time employees of the Town.
Mr. Clapinski testified that his findings were based on a review of the Town’s personnel files, time sheets, payroll records and handbook, as well as interviews with Town personnel, which demonstrates Defendant’s actions by clear and convincing evidence. This act is. relevant to the conduct charged in Counts II and III, and the probative value of this evidence outweighs its prejudicial effect.
*184 9. Defendant made personal use of the Town’s vehicle.
Mr. Clapinski testified that, of 35,-000 miles traveled, only 7,200 could be attributed to legitimate travel related to Town business. He noted that he reviewed records from the Town’s pump, the vehicle’s odometer and reports from Town residents about Defendant’s personal use of the vehicle, and this evidence meets the clear and convincing standard. However, this alleged act does not appear similar to the charged offenses and, therefore, should not have been introduced into evidence.
17S10. Defendant failed to timely reimburse the Town for unused travel advances.
Mr. Clapinski testified that this act by Defendant was determined from his expense reports. He noted that he was unaware if the Town’s personnel policy set forth a specific time period for repayment. In the absence of a specific ordinance or policy providing exactly when such monies should be repaid, the clear and convincing standard has not been met, and Defendant’s “untimely” payment of the unused travel advances should not have been introduced into evidence.
11. Defendant failed to remit unclaimed property to the state.
Mr. Clapinski testified that the auditors found approximately 200 unclaimed checks for returned utility deposits, which amounted to approximately $6,000. He explained that, pursuant to state law, a municipality in possession of unclaimed property must report and remit the amounts to the state treasurer on a yearly basis. This shows by clear and convincing evidence that Defendant failed to supervise and direct the administration and operation of all municipal departments and illustrates the failures as to record-keeping, which is similar to the acts alleged in Count I. The probative value of this evidence outweighs its prejudicial effect.
Although the trial court erred in failing to examine each of the 11 alleged acts individually and improperly admitted into evidence the alleged acts (the sale of Town property, the inauguration celebration, the appointment of the fiscal administrator, the personal use of the Town vehicle and the untimely reimbursement of travel advances), the admission |7fiof this evidence was harmless error. The inclusion of these alleged acts did not appear to contribute to the verdict, and the guilty verdict was unattributable to the error. See, Sullivan v. Louisiana, supra, and Chapman v. California, supra. In this case, the state presented ample evidence upon which the jury could base its verdicts. There is no showing that introducing evidence of these alleged acts resulted in any prejudice in the mind of the jury or that Defendant suffered substantial prejudice such that he could not receive a fair trial.
Given the full facts and circumstances of this case, the improper introduction of these alleged acts as 404(B) evidence was harmless error. Accordingly, this assignment of error lacks merit.

Motion to Quash

In his seventh counseled assignment of error, Defendant argues that the trial court erred in denying his motion to quash pursuant to La.C.Cr.P. art. 572(2). Defendant explains that Count I of the bill of information charged an offense occurring more than four years before its filing.
The state argues that the motion to quash was properly denied because the offense was committed over a period of time.
*185 La. C. Cr. P. Art. 572(A) states, in part, that:
no person shall be prosecuted, tried, or punished for an offense not punishable by death or life imprisonment, unless the prosecution is instituted within the following periods of time after the offense has been committed:
[[Image here]]
(2) Four years, for a felony not necessarily punishable by imprisonment at hard labor.
177La. C. Cr. P. art. 573 explains the commencement of these time limitations and states, in part, that:
The time limitations established by Article 572 shall not commence to run as to the following offenses until the relationship or status involved has ceased to exist when:
(1) The offense charged is based on the misappropriation of any money or thing of value by one who, by virtue of his office, employment, or fiduciary relationship, has been entrusted therewith or has control thereof.
The evidence presented at trial demonstrates that the offenses included in Count I were ongoing from June 30, 2007, through June 30, 2012. The testimony of the auditors and the financial reports show that the Town’s failure to maintain the public records and provide sufficient records for timely annual audits were ongoing occurrences during Defendant’s tenure as mayor. Furthermore, the exception set forth in La. C. Cr. P. art. 573(1) applies because Defendant, as mayor, was in a position of trust and control regarding the management and administration of the Town and the public funds and the public records of the Town, which are things of value.
Accordingly, this assignment of error is without merit.
Motion for Mistrial — Prosecutorial Misconduct
In his eighth counseled assignment of error, Defendant argues that the trial court erred in failing to grant a mistrial' for prosecutorial misconduct. Defendant contends that the effort to keep race from being a factor in the trial failed. He states that he objected during voir dire to the state’s use of photos of Osama Bin Laden and President Barack Obama and interchanging their names. He notes that the prosecutor asked questions regarding the 17SGeorge Zimmerman case and alleges that the state subpoenaed Defendant’s supporters in order to keep them out of the courtroom. Defendant also points out that the prosecutor accused the defense attorney of talking about “white people” in front of the jury. In his fifth pro se assignment of error, Defendant argues that the trial court erred when it failed to grant a mistrial based on the prosecutor’s comments on race.
The state argues that there was no pros-ecutorial misconduct to justify a mistrial. It explains that the defense injected race into the case from the very beginning and questioned potential jurors about race during voir dire; and, therefore, it was appropriate for the, prosecutor to respond.
La. C. Cr. P. art. 770 discusses prejudicial remarks as a ground for mistrial and states, in part, that:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create *186 prejudice against the defendant in the mind of the jury;
[[Image here]]
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
La. C. Cr. P. art. 775 explains the permissive and mandatory grounds for a mistrial and states, in part:
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
A mistrial is a drastic remedy that is warranted only when the defendant has received substantial prejudice such that he cannot receive a fair trial. State v. Harris, 383 So.2d 1 (La.1980), citing State v. Williams, 375 So.2d 364 (La.1979).
La. C. Cr. P. art. 921 provides that a judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity or variance that does not affect the substantial rights of the accused. Appellate courts should not reverse convictions for errors unless the accused’s substantial rights have been violated. State v. Johnson, supra.
Even if a mistrial is warranted under La. C. Cr. P. art. 770, the failure to grant a mistrial does not result in an automatic reversal of a defendant’s conviction, but is a trial error subject to the harmless error analysis on appeal: State v. Roberson, 46,697 (La.App.2d Cir.12/14/11), 81 So.3d 911, writ denied, 12-0086 (La.4/20/12), 85 So.3d 1270, citing State v. Givens, 99-3518 (La.1/17/01), 776 So.2d 443, and State v. Johnson, supra.
During voir dire, both parties questioned potential jurors about race, but neither appeared to say anything directly connecting race to the facts of this case. However, race was brought up in direct relation to the .case during the state’s opening statement and during the state’s examination of witnesses. We note a distinction between exploring the biases and prejudices of potential jurors during voir dire and improperly injecting race as an issue at trial. The prosecutor’s reference to “white people” while questioning Mr. Purpera was a direct reference to race and was not an accurate restatement of what the defense attorney said in his opening | Snstatement or voir dire questioning. The defense attorney did not allege that “white people” or “conservatives” made allegations against Defendant that led to investigations; the defense attorney merely noted that Defendant had detractors who were unhappy that he was elected mayor. Although the trial court overruled the objection and the motion for mistrial because the defense raised the issue of race during voir dire and during opening statements, this ruling was a misconstruction of the defense’s comments during opening statements.
As stated supra, La. C. Cr. P. art. 770 mandates a mistrial on the motion of the defendant when the district attorney, during trial or in argument, refers directly or indirectly to race, if the remark is not material, is not relevant and might create prejudice against the defendant in the mind of the jury. In addition to being an incorrect restatement of the defense’s voir dire questioning and opening statements, the prosecutor’s comment about “white people” was neither material nor relevant to the charges and, arguably, could create *187 prejudice in the mind of the jury. Accordingly, the trial court could have granted a mistrial based on the improper remark regarding race made by the prosecutor.[16]
Despite the trial court’s misplaced reasoning for denying Defendant’s motion for mistrial, we reluctantly are constrained by precedence to find that the failure to grant a mistrial was harmless error. The comment made by the prosecutor, while improper under La. C. Cr. P. art. 770, did not appear to contribute to the verdict, and the guilty verdict was unattributable to the error. See, Sullivan v. Louisiana, supra, and Chapman v. California, supra. During voir dire, the potential jurors were advised that race had no place in determining the guilt or innocence of Defendant and that their decision had to be based solely on the evidence presented at trial. In this case, the state presented overwhelming evidence against Defendant upon which the jury could base its verdicts. There is ho showing that the prosecutor’s comment, while not material or relevant to the charges, resulted in any prejudice in the mind of the jury or that Defendant suffered substantial prejudice such that he could not receive a fair trial.
Given the full facts and circumstances of this case, the prosecutor’s comment was a harmless error, and the verdict rendered was unattributable to the error. Accordingly, this assignment of error lacks merit.

Double Jeopardy and Lenity

In his ninth counseled assignment of error, Defendant argues that the trial court erred in failing to grant his motion to quash based on double jeopardy. Defendant contends that being charged under both La. R.S. 14:134 and La. R.S. 24:518 constituted double jeopardy. He states that his removal from office demonstrates that he was penalized pursuant to La. R.S. 24:518. In the alternative, he argues that the trial court should have applied the principle of lenity.
The state argues that the motion to quash was properly denied. It contends that Defendant was not charged twice because, when charging malfeasance in office, the state must first charge malfeasance and then prove the existence of an affirmative duty delineated by statute or law.
No person shall be twice placed in jeopardy for the same offense. U.S. Const. Amend. V; La. Const. Art. I, § 15; La. C. Cr. P. art. 591.
As discussed in the analysis of the sufficiency of the evidence, supra, for a public official to be charged with malfeasance in office, there must be a statute or provision of the law that delineates an affirmative duty upon the official. State v. Perez, supra, citing State v. Passman, supra.
The bill of information clearly states that Defendant was charged with three counts of malfeasance, violations of La. R.S. 14:134. In this case, La. R.S. 24:518 defines- the duty that Defendant was alleged to have violated that amounted to malfeasance. Further, Defendant was sentenced pursuant to La. R.S. 14:134, not R.S. 24:518. The sentence imposed for his conviction of malfeasance in office did not remove Defendant from office. Instead, Defendant was suspended from office as a result of his conviction, pending the finality of his conviction. La. R.S. 42:1411 and 1412.
As to the defense’s assertion that the trial court should have applied lenity, the statutory penalties for malfeasance in office are not indefinite or inconsistent as *188 contemplated in State v. Piazza, 596 So.2d 817 (La.1992). Defendant has not demonstrated that he is entitled to a lesser sentence under the doctrine of lenity.
Accordingly, this assignment of error is without merit.

Recusal of Tnal Judge

In his tenth counseled assignment of error, Defendant argues that the trial court erred in failing to recuse Judge Teat from presiding over the criminal trial when he had presided over the civil trial regarding the same facts and issues.
The state argues that there was no basis to recuse Judge Teat as trial judge because he did not perform a judicial act in this case in another court. The state notes that the trial judge presided over a suit brought by the state to appoint a fiscal administrator for the Town, which is not the same case as the case sub judice.
La.C.Cr.P. art. 671 sets forth the grounds for recusation of a judge and states, in part, that:
A. In a criminal case a judge of any court, trial or appellate, shall be recused when he:
(1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial;
(2) Is the spouse of the accused, of the party injured, of an attorney employed in the cause, or of the district attorney; or is related to the accused or the party injured, or to the spouse of the accused or party injured, within the fourth degree; or is related to an attorney employed in the cause or to the district attorney, or to the spouse of either, within the second degree;
(3) Has been employed or consulted as an attorney in the cause, or has been associated with an attorney during the latter’s employment in the cause;
(4) Is a witness in the cause;
(5) Has performed a judicial act in the case in another court; or
(6) Would be unable, for any other reason, to conduct a fair and impartial trial.
As noted by Judge Clason when denying the motion, the fact that Judge Teat presided over civil cases against Defendant, signed judgments adverse to Defendant and remarked that Defendant was guilty of offenses ^related to the offenses charged in this proceeding have all been found by various courts to be insufficient grounds to support a motion to recuse the judge.[17] Furthermore, there is no showing that Judge Teat was biased or prejudiced against Defendant or that he could not conduct a fair and impartial criminal trial simply because the prior civil judgments were adverse to Defendant.
Accordingly, this assignment of error is without merit.

Revocation of Bail

In his fourth pro se assignment of error, Defendant argues that the trial court erred in revoking his bail. He contends that his attendance, as a citizen, at a public council meeting may have outraged the judge, but it did not rise to the level of a criminal act, i.e., usurpation of office, for *189 the purpose of revoking bail. Defendant states that he was unaware that a condition of bail was to give up his right to peaceably assemble and of freedom of speech.
This court previously addressed this issue when Defendant filed a writ as to this precise issue. State v. Leslie C. Thompson, 48,916-KW (La.App.2d Cir.10/9/13). The trial court sentenced Defendant within the time period ordered by this court, and Defendant is currently incarcerated in accordance with his sentence. This issue is now moot.
| ^Accordingly, this assignment of error is without merit.

Weapons in the Courtroom

In his sixth pro se assignment of error, Defendant argues that the trial court erred when it denied his motion to prevent the prosecutor from bringing weapons into the courtroom during trial. He contends that the prosecutor’s carrying of a firearm in the courtroom prejudiced the jury by creating an atmosphere of tension by the use of race, terrorism and the need to carry a gun, all of which affected Defendant’s right to a fair trial.
The trial court did not deny Defendant’s motion for certain measures for security.' It granted this motion, and metal detectors were installed so that anyone entering the courthouse would have to pass through them. It further provided that only law enforcement officers could carry weapons in the courtroom. Further, no evidence was offered that the prosecutor carried a gun in the courtroom during the trial.
Accordingly, this assignment of error is without merit.

Witness as Case Agent

In his seventh pro se assignment of error, Defendant argues that the trial court erred when it allowed a witness to serve as case agent. Defendant contends that Investigator Horton, who was the arresting officer and a witness, should not have served in the capacity of the state’s case agent.
Prior to trial, the state explained that it did not intend to call Investigator Horton as a witness in the case, and his subpoena was recalled. Investigator Horton was not called as a witness in this case.
Accordingly, this assignment of error is without merit.
| w-Motion to Change Venue
In his eighth pro se assignment of error, Defendant argues that the trial court erred when it denied his motion for change of venue. Defendant contends that the issue of race was at the core of this case and that there is a history of racial intolerance in the community. He further contends that, because of these racial tensions and the media coverage of the legal proceedings, his due process rights were violated when his request to change the venue of the trial was denied.
A motion for a change of venue, as other pretrial motions, shall be filed in accordance with La. C. Cr. P. art. 521; or thereafter, in the discretion of the court, any time before the first witness is sworn at the trial of the merits. La. C. .Cr. P. art. 621. La. C. Cr. P. art. 622 sets forth the grounds for change of venue and states:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the *190 answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
A defendant has the burden to establish that he cannot obtain a fair trial in the current parish by showing more than just the public’s general knowledge or familiarity with the facts of the case. State v. Magee, 11-0574 (La.9/28/12), 103 So.3d 285, citing State v. Clark, 02-1463 (La.6/27/03), 851 So.2d 1055, and State v. Frank, 99-0553 (La.1/17/01), 803 So.2d 1, as revised (Apr. 16, 2001). He must show the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case and that, as a result of this prejudice, a fair trial is impossible. Id., citing State v. Clark, supra.
Defendant raised his motion after voir dire was completed and a jury was selected. During voir dire, the issue of media coverage of the case was addressed, and the potential jurors were questioned about pretrial publicity. Those potential jurors who stated they could not ignore what they had heard in the media about the case and could not decide the case based solely on the evidence presented at trial were not selected to serve on the jury. Furthermore, the majority of the state’s witnesses were not from the community and offered testimony regarding financial reports.of the Town. Defendant has failed to establish that the jurors and the witnesses were unduly influenced by publicity so as to deny him a fair and impartial trial in that parish.
Accordingly, this assignment of error is without merit.
Batson Challenge
In his ninth pro se assignment of error, Defendant argues that the trial court erred when it neglected to consider his Batson motion. He alleges that the selection of an all-white jury deprived him of due process and that he objected to the panel because his race was not represented on the panel. He contends that the trial court did not take this issue seriously enough and should have at least held a hearing at which the prosecution could offer race-neutral explanations for the composition of the jury.
 The United States Supreme Court set forth the analysis for a Batson challenge, see Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), as follows:
In Batson, we outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. The analysis set forth in Bat-son permits prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a.race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. This three-step inquiry delimits our consideration of the arguments raised by petitioner.
Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (citations omitted). > The Batson court explained that an “action claimed to be racially discriminatory ‘must ultimately be traced to a racially discriminatory purpose.’ ” Batson v. Kentucky, supra, quoting Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Thus, the sole focus of the Batson inquiry is *191 upon the intent of the prosecutor at the time he exercised his peremptory challenges. State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272.
The first step in this process places a burden on the defendant to make a prima facie case of racial discrimination. Hernandez v. New York, supra; State v. Green, supra. If the defendant is unable to meet his burden of proof, then the Batson challenge fails, and it is not necessary for the prosecutor to articulate race-neutral explanations for his peremptory challenges. Hernandez v. New York, supra; State v. Green, supra. The Louisiana Supreme Court in State v. Green, supra, explained:
The defendant may offer any facts relevant to the question of the prosecutor’s discriminatory intent to satisfy this burden. Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect-class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was' motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination.
(citations omitted).
In the case sub judice, Defendant raised a Batson challenge based on the state’s, use of one peremptory challenge. Defendant alleged that the state dismissed the juror because the juror is African-American and noted that all African-American potential jurors had been eliminated from the jury pool by challenges for'cause and the state’s one peremptory challenge. The trial court denied Defendant’s motion, finding that the state’s use of one peremptory challenge was not enough to demonstrate that it did so on the basis of race. The trial court noted that both parties had remaining peremptory challenges and stated that, if the remaining potential jurors on the panel were not selected, another panel of potential jurors would be brought in for questioning, which might change the racial composition of the jury and, therefore, make the issue moot. The trial court also stated that the defense could raise its challenge again if additional challenges were exercised.
We note that the record does not include information on the raees of the potential and seated jurors in this case. The comments made by the parties and the trial court during the Batson colloquy are consistent and | ¡^suggest that Defendant’s allegations regarding the race of the juror the state struck and racial composition of the jury are true. However, the potential jurors were not asked to state their races on the record, and any questionnaires of personal information includ-. ing race that may have been filled out by the potential jurors were not submitted to this court for review. We note that it is best practice for a trial court to have potential jurors state their races and gender on the record so that a reviewing court is aware of how the juro/s identify themselves.
Assuming that the statements regarding race made during the Batson colloquy are true, Defendant did not meet his burden of making a prima facie case of racial discrimination by the state. At the time Defendant made his motion, the state had exercised only one of its peremptory challenges. The trial court considered whether there were race-neutral grounds for the challenge and found there were, i.e., that the challenged juror said he was friends with Defendant. Further, neither party exhausted its peremptory challenges and, instead, accepted the panel of jurors that existed after the questioning of two *192 panels of potential jurors. Had the parties chosen to use additional peremptory challenges on the second panel or exercised strike backs on the first panel, a third panel could have been questioned. From this third panel, it is possible that the alleged racial composition of the jury could have been different.
Accordingly, this assignment of error is without merit.
| a,Jury Sequestration
In his tenth pro se assignment of error, Defendant argues that the trial court erred when it denied the motion to sequester the jury. Defendant reiterates the racial tensions in the community and contends that the sequestration of the jury may have helped prevent the jurors from, feeling like they were being “pulled in different directions as a result of the community being so split on this trial.”
In noncapital cases, a jury shall be sequestered after the court’s charge and may be sequestered at any time upon order of the court. La. C. Cr. P. art. 791. In other words, the trial court has discretion to decide whether to sequester a jury in a noncapital case. State v. Williams, 445 So.2d 1171 (La.1984).
Defendant filed his motion on the morning that jury selection was to begin. The trial court took his motion under advisement during voir dire and stated that it would revisit the issue if needed depending on the potential jurors’ responses to questions. After the jury was selected, the trial court determined that sequestration was not needed in this case and denied the motion. Once the jury was sworn in, the trial court instructed the jurors not to talk to anyone about the case, to refrain from reading or watching news reports and to avoid social media during the trial. Defendant has not shown that the jurors disregarded the trial court’s instructions or that he was prejudiced because the jury was not sequestered.
Accordingly, this assignment of error is without merit.

J^ERROR PATENT

We note that the record indicates an error patént. There was no delay after the denial of Defendant’s motion for new trial and motion in arrest of judgment and before sentencing. There is no showing on the record that Defendant waived the delay required by La. C. Cr. P. art. 873. However, Defendant did not raise this issue on appeal or demonstrate that he was prejudiced by the failure to delay sentencing, so the error appears harmless. See State v. Roberson, 929 So.2d 789, supra.

CONCLUSION

For the foregoing reasons, the convictions of Defendant, Leslie C. Thompson, are affirmed. His sentences are vacated, and the matter is remanded to the trial court for resentencing consistent with this opinion.
CONVICTIONS AFFIRMED. SENTENCES VACATED. REMANDED FOR RESENTENCING CONSISTENT WITH THIS OPINION.

. Defendant also alleged that Count I does not give a plain, concise and definite written statement of the essential facts and does not give the times, dates or places of when the alleged acts occurred. He also argued that the bill of information charged violations of civil laws and contended that La. R.S. 14:134 is unconstitutional because of vagueness.

. On March 28, 2013, Defendant filed an amended motion in which he noted cases in which he was named a defendant that Judge Teat presided over and gave relief outside of that prayed for by the plaintiff.

. Following the filing of Defendant’s motion to recuse, tire case was reassigned to Judge Clason.

. Judge Teat presided over the case of Essmeier v. Town of Jonesboro, 47,225 (La.App.2d Cir.12/19/12), 108 So.3d 209, writ denied, 13-0172 (La. 1/23/13), 105 So.3d 59, in which he imposed a preliminary injunction against the Town, the mayor and the board of aldermen, enjoining them from making any expenditures under ordinance numbers 700 and 701, which concerned the budget and increasing the mayor’s salary.

. The Zimmerman case gained national media attention in 2012 when Zimmerman, a Hispanic man, shot and killed Martin, an African-American teenager. The media coverage often included the issue of the races of Zimmerman and Martin.

. Mr. Purpera explained that compliance and investigative audits have different names, but are the same type of audits.

. The Legislative Auditor Advisory Council is composed of five state senators and five state representatives. The Fiscal Review Committee is composed of Mr. Purpera, the attorney general and the state treasurer.

. Defendant waived his attorney-client privilege as to the land sale and MERS.

. He also noted that a videographer was hired, but his invoice or a confirmation of payment was not available when the audit was completed.

. Ms. Holland testified that one of the defense counsel spoke with her prior to her testimony and directed her as to appropriate answers to give during her testimony. She stated that the testimony she gave at trial was consistent with those instructions and that her answers to defense counsel were not truthful.

. One judge dissented, noting that the trial court "pinned its decision to revoke bail on a finding that [Defendant] committed the offense of usurpation of public office.... It is not clear that the state has ever formally charged [Defendant] with this offense.” The dissenting judge also noted that, although Defendant was automatically suspended from office pursuant to La. R.S. 42:1411, his actual removal from office could not occur until ten days after the conviction was final pursuant to La. R.S. 42:1412. The judge questioned how Defendant could usurp the position to which he was elected and from which he had not yet been formally removed.

. Appellate briefs were filed both by Defendant’s counsel and by Defendant, pro se. In these briefs, he designated ten counseled assignments of error and ten pro se assignments of error. Some assignments of error are argued in both briefs. The state objected to Defendant filing two briefs because, in doing so, he greatly exceeded the rules on filing timely briefs. In its brief, the state responded to the assignments of error raised in Defendant's counseled brief, but did not respond to the assignments of error raised in Defendant’s pro se brief.

. A new provision, added after the incidents in this matter occurred, states that malfeasance is established by three consecutive disclaimers for an auditee when the same person served as agency head for those three years and the legislative auditor determines the failure to maintain the necessary records was willful. La. R.S. 24:518(D).

. Defendant incorporates the arguments made as to Count I regarding the duties of the town clerk.

. Defendant incorporates the arguments made as to Count I regarding the duties of the town clerk.

. The possible introduction of race into any case and a motion for mistrial require the trial court to carefully and accurately consider the totality of the circumstances.

. In her oral ruling, Judge Clason cited the following appellate opinions: State v. Branch, 30,733 (La.App.2d Cir. 7/6/98), 714 So.2d 1277, writ denied, 98-2359 (La. 1/8/99), 734 So.2d 1227; State v. Bell, 346 So.2d 1090 (La.1977); State v. Tanner, 224 La. 374, 69 So.2d 505 (La.1953); State v. Rollins, 32,686 (La.App.2d Cir. 12/22/99), 749 So.2d 890, writ denied, 00-0549 (La. 9/15/00), 768 So.2d 1278; State v. Dooley, 38,763 (La.App.2d Cir.9/22/04), 882 So.2d 731, writ denied, 04-2645 (La.2/18/05), 896 So.2d 30; State v. Willis, 05-218 (La.App. 3d Cir. 11/2/05), 915 So.2d 365, writ denied, 06-0186 (La.6/23/06), 930 So.2d 973.